277 F.2d 94
 William P. ROGERS, Attorney General of United States, Robert B. Anderson, Secretary of Treasury, and Ralph Kelly, Commissioner of Customs, Appellants,
v.
ERCONA CAMERA CORPORATION and Steelmasters, Incorporated, Appellees.
 No. 14856.
 United States Court of Appeals District of Columbia Circuit.
 Argued October 16, 1959.
 Decided March 17, 1960.
 
 Mr. Irving Jaffe, Atty., Dept. of Justice, for appellants. Messrs. George B. Searls and Irwin A. Seibel, Attys., Dept. of Justice, were on the brief for appellants. Mr. Walter T. Nolte, Atty., Dept. of Justice, also entered an appearance for appellants.
 Mr. Harry I. Rand, Washington, D. C., for appellees.
 Before PRETTYMAN, Chief Judge, and WASHINGTON and BASTIAN, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 This suit was instituted in the District Court by the appellees, Steelmasters and Ercona, against three Government officials, appellants here. It prayed for a declaratory judgment that the Attorney General acquired no rights of ownership in the German trademark "Zeiss" as a result of various purported seizures under Section 7(c) of the Trading With the Enemy Act, 40 Stat. 416 (1917), as amended, 50 U.S.C.A.Appendix, § 7(c) and for an injunction against an embargo on the importation and sale in the United States by the plaintiffs-appellees of Zeiss-marked products from East Germany. The District Court concluded that the attempts to vest the Zeiss trademark in the Alien Property Custodian and his successor, the Attorney General,[1] were ineffective, because the mark was not appurtenant to any business conducted in the United States which was seized. Hence, it ordered the injunction prayed for. The principal question on appeal is whether the Attorney General can be deemed to have sufficient ownership rights in the Zeiss trademark to enable him to prohibit the use of the mark by the appellees on the goods they import. A brief statement of the facts, first of the period from 1912-1941, and then the period 1942 to the present, will illuminate the issue before us.
 
 
 2
 The trademark "Zeiss" was first registered in the U. S. Patent Office on February 20, 1912, by the German firm known as Carl Zeiss, which was engaged in the manufacture and sale of scientific, optical, and photographic instruments and equipment at Jena, Germany (hereafter referred to as "Zeiss Jena"). The trademark had long before this been used continuously in its business. Thereafter until 1926 (with the exception of a period during the First World War) Zeiss Jena sold its "Zeiss"-marked products in the United States to various wholesalers and retailers. Commencing in 1920, however, its sales were made predominantly through a New York firm known as Harold M. Bennett, which was under its control. In 1925 a corporation, Carl Zeiss, Inc., was organized under the laws of New York (hereafter called "Zeiss New York"), all its stock being owned by or for the benefit of Zeiss Jena. Thereafter until 1941 (when World War II hostilities interfered) Zeiss Jena sold its Zeiss-marked products in the United States predominantly to Zeiss New York, although it also continued to sell to other concerns.
 
 
 3
 In 1919 the Alien Property Custodian of the United States undertook to seize from Zeiss Jena as an enemy the registered trademark Zeiss "and the business of said enemy appurtenant thereto," under the Trading With the Enemy Act. In 1921 the then Custodian again "seized" the Zeiss mark with its appurtenant business. Following both purported seizures, he assigned the mark and the business and goodwill appurtenant thereto to a firm called The Chemical Foundation (hereafter referred to as "Chemical"), which later in 1921 granted the United States a royalty-free, non-exclusive, and non-assignable license to use the Zeiss mark in the United States. The mark was never used by the United States, however, in the manufacture or marketing of products. The registration of the mark in the U. S. Patent Office was renewed by Chemical in 1932.
 
 
 4
 In 1942 the Alien Property Custodian issued a vesting order, vesting in himself all of the capital stock of Zeiss New York, then owned by Zeiss Jena, and all rights of Zeiss Jena in any indebtedness owed to it by Zeiss New York. It is not disputed by the parties in this case that since 1942 the stock of Zeiss New York has been completely owned by the Attorney General.[2] The firm imported no German "Zeiss" products during World War II.
 
 
 5
 After the cessation of World War II hostilities, some 126 employees of Zeiss Jena, including scientists, designers, technicians, and managing personnel, were moved from Jena (in the Eastern Zone of Germany) to West Germany, where they engaged in the manufacture and sale of Zeiss-marked products at plants established by Zeiss Jena in West Germany. (These plants will be referred to as "Zeiss West.") Some employees remained at Jena and continued to manufacture Zeiss-marked products there. In 1945, the plants and business at Jena were sequestered by the occupying Soviet authorities and in 1948 they were confiscated by the East German Government and became "Property of the People" operated by a firm called "Optik, Carl Zeiss, Jena, V.E.B." (hereafter called "Optik Jena"). Optik Jena continued to use the Zeiss trademark on its products. Following confiscation of the Jena plants and business, the domicile of Zeiss Jena was registered in West Germany.
 
 
 6
 Notwithstanding the confiscation, Zeiss Jena as so registered (Zeiss West) maintained business relations with the Jena plant and until 1950 acted as sales agent of the latter, outside the Soviet bloc, for those Jena products which were not manufactured in West Germany or were not produced in sufficient quantity there. From the end of World War II until 1950 Zeiss New York (wholly owned by the Attorney General), as well as other concerns in the United States, imported and sold both the Jena-produced and the Zeiss West products.
 
 
 7
 In 1950 the appellee Steelmasters entered into a contract with Optik Jena, under which Steelmasters was given the exclusive right to import into the United States the products of the Optik Jena plant. Appellee Ercona was then organized by Steelmasters to serve as exclusive distributor of such products in the United States. Thereafter up to the present time Zeiss New York has bought and sold in the United States only such Zeiss-marked products as were manufactured in West Germany.
 
 
 8
 In 1950 Chemical, then dissolved, executed an assignment to the Attorney General of its interest in the Zeiss mark. In 1951 Chemical's successor corporation, to which Chemical's trademarks had been conveyed, ratified this assignment. In 1952 the registration of the mark in the U. S. Patent Office was renewed by the Attorney General.
 
 
 9
 In 1953 the Attorney General issued a Vesting Order purporting to vest in himself all interest of Zeiss Jena and its successors and assigns in the "goodwill" of the business of Zeiss New York and in all "trade-marks and trade-names appurtenant to such business or heretofore transferred or assigned to, or now owned by, the Attorney General."
 
 
 10
 In 1951, over the objection of Steel-masters, the Secretary of the Treasury recorded the Zeiss trademark as registered in the Attorney General under Section 42 of the Trade-Mark Act of 1946, 60 Stat. 440, 15 U.S.C.A. § 1124, and Section 526 of the Tariff Act of 1930, 46 Stat. 741, 19 U.S.C.A. § 1526, and notified Steelmasters that it would thereafter be barred from importing any goods bearing the "Zeiss" mark unless written consent had first been obtained from the Attorney General. All Collectors of Customs were notified to withhold entry to all goods bearing the "Zeiss" mark without such consent. Until August 21, 1955, the Attorney General gave his consent to the importation by Steelmasters of certain shipments of Jena-produced Zeiss goods but refused it with respect to other shipments. In June, 1955, the Attorney General notified Steelmasters that effective August 21, 1955, he would authorize only importation of Zeiss West products, and would not allow the importation of Zeiss-marked Optik Jena products. This suit followed.
 
 
 11
 The Attorney General has undertaken to bar the importation of Zeiss-marked Jena products solely on the premise that he owns the trademark "Zeiss" in the United States. We are not required to consider or decide whether Zeiss-marked products produced in East Germany may be barred from the United States for some other reason.[3] Similarly, we are not required to consider or decide whether Optik Jena possesses any rights of ownership in the mark.[4] Our only question is whether the Attorney General acquired a sufficient interest in the United States rights in the trademark by reason of the various seizures of the mark to entitle him to bar use of the trademark in the United States by others.
 
 
 12
 
 Effect of the seizures made in 1919 and 1921, and transfers made to and from Chemical Foundation
 
 
 
 13
 We turn first to the interest the Attorney General may have as a result of the "seizures" of the registered trade-mark by the Alien Property Custodian in 1919 and 1921, his conveyance of the seized mark to Chemical Foundation, and Chemical's subsequent assignment, ratified by Chemical's successor, of its interest in the mark to the Attorney General in 1950-1951.
 
 
 14
 We take it as settled that ownership rights in a trademark in the United States, in the case of private persons, exist only as an appurtenance to a manufacturing or marketing business conducted in the United States in which the mark is used.[5] As we stated in Watson v. E. Leitz, Inc., 1958, 103 U.S.App.D.C. 74, 77, 254 F.2d 777, 780:
 
 
 15
 "A trademark must be appurtenant to some enterprise which is related to the marketing of goods. It is both philosophically and legally impossible for it to exist in gross. But a merchant as well as a manufacturer may have a trademark."
 
 
 16
 Or as phrased in United Drug Co. v. Rectanus Co., 1918, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141:
 
 
 17
 "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. Hanover [Star] Milling Co. v. Metcalf, 240 U.S. 403, 412-414 [36 S. Ct. 357, 60 L.Ed. 713]."
 
 
 18
 Indeed, the appellants seem to agree. They say on brief that:
 
 
 19
 "* * * unless and until you do business under the mark in a particular market area, you acquire no rights to the use of the mark in that area."
 
 
 20
 The manufacture of Zeiss-marked products and the placing of the mark upon them has always occurred entirely in Germany, and never in the United States. But following registration of the mark in the United States in 1912 until the present, Zeiss Jena has marketed its products in the United States. Although the record is not entirely clear on this point, it appears to have sold its products in the United States first directly on its own and then commencing in 1920 until 1941 principally through wholly-owned or controlled representatives in the United States, to which it never formally assigned the United States rights in its trademark.
 
 
 21
 In 1919 and again in 1921 the Alien Property Custodian purported to seize the Zeiss trademark and the business of Zeiss Jena appurtenant thereto. Hicks v. Anchor Packing Co., 3 Cir., 1926, 16 F.2d 723, supports the view that a seizure of a trademark and the appurtenant selling business would vest in the Custodian the United States rights to the trademark. But in Hicks at the time of seizure there was an existing license given by the German manufacturer, renewed by the Federal Trade Commission under its wartime powers, for use of the mark on United States manufactured products; and shortly after seizing the mark the Custodian instituted suit to recover the fees due under this license. The Custodian's ability to carry on the seized business thus was not dependent on a German source of supply and he was able at once to assert his rights of ownership in the seized mark and over the selling business appurtenant thereto.[6]
 
 
 22
 The present case is very different. In both 1919 and 1921 the Custodian purported to seize the business of Zeiss Jena appurtenant to the Zeiss mark in the United States, that is, the business of marketing in the United States Zeiss goods made in Germany. There was of course no existing license for use of the mark on goods manufactured in the United States. The Custodian did not undertake to seize any business assets of Zeiss Jena, presumably because that firm had none in the United States. He did not and could not seize the German source of supply of Zeiss products. He made no attempt to market German-produced Zeiss products in the United States. His purported seizure of Zeiss' business thus had no substance. The record moreover shows that the 1919 seizure occurred at a time when, due to World War I, Zeiss-marked products were not being marketed in the United States; thus, there was then no existing business to be seized. Although marketing of the Zeiss products in the United States was resumed in 1920, the Bennett firm, wholly controlled by Zeiss Jena, was formed to act as the principal importer and distributor. When the Custodian seized the trademark in 1921, he made no seizure of the Bennett business or of any of its assets; nor did he or his assignee attempt to appropriate or otherwise interfere with the conduct of the Bennett business or that of other local distributors, if any. We must conclude that the formal language in the Custodian's seizure demand form was ineffective to seize any business appurtenant to the trademark.
 
 
 23
 We have not overlooked the holding of some cases[7] that a transfer of a trademark will not be deemed to be a transfer in gross if under the contract it appears that it was transferred for use in a business to be established and if it was so used. But here at the time of seizure it was not possible to establish a business in which the mark could be used and none was established.[8] Upon termination of the first World War, it is possible that the Custodian or his successor in interest might have attempted to secure the right from Zeiss Jena to import and sell its products in the United States. This was not done, however, by the Custodian or his assignee, Chemical. Further, neither undertook to enforce a claim to license fees from those who did market Zeiss products in the United States.[9] Thus, even assuming that the Custodian could by assignment place Chemical in his shoes, there is no basis here for a conclusion that the Custodian's seizures encompassed an existing business or one to be established or that they amounted to anything more than seizure of a trademark in gross. As such, if general trademark principles are applied, the attempted seizure would give the Custodian no property rights in the mark and no right to its exclusive use.
 
 
 24
 But this would not end the matter if Congress intended to exempt the Custodian from principles of trademark law generally applicable and to authorize him to seize a naked trademark. Section 7(c) of the Trading With the Enemy Act, 40 Stat. 416 (1917), as amended, 50 U.S.C.A. Appendix, 7(c), authorized the Alien Property Custodian to seize
 
 
 25
 "patents, copyrights, applications therefor, and rights to apply for the same, trade marks, choses in action, and rights and claims of every character and description"
 
 
 26
 belonging to an enemy. Although the seizure provisions were clearly designed to permit the United States to take title to and possession of all property in this country which was owned by enemy aliens,[10] it does not follow that Congress intended to create new rules of property applicable to the Custodian alone. It seems to us entirely unlikely that Congress intended by use of the term "trade marks," without more, to depart from the existing commercial and legal concepts surrounding that term so as to authorize seizure of a bare mark disassociated from the business in which it was used. And the legislative background of the provision confirms this view.
 
 
 27
 As originally enacted, the 1917 Act made no reference to trademarks. The language quoted above was added by Section 1 of the Deficiency Appropriation Act of November 4, 1918, 40 Stat. 1020, which amended Section 7(c) of the Trading With the Enemy Act to read as quoted. The genesis of the amendment is related in United States v. Chemical Foundation, 3 Cir., 1925, 5 F.2d 191, 200, affirmed as modified, 1926, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 as follows:
 
 
 28
 "Under this power [the power to sell seized properties to United States citizens], Mr. Palmer [the then Custodian] sold many seized properties. Before long, however, he discovered that a number of enemy-owned businesses were conducted under enemy-owned patents, and that, consequently, to sell the physical assets without the appurtenant patent rights meant to give the purchaser not a business but a lifeless plant. To remedy this situation he had to have authority to sell patents as well as physical property. Being in doubt as to his power to do this, he asked for an opinion by the Attorney General who replied that the Act, as it stood, did not confer power to seize and sell patents. To overcome that difficulty an amendment to section 7c of the Act was drafted and proposed to Congress by Mr. Palmer and, on November 4, 1918, Congress amended the Act by authorizing the seizure of `patents, copyrights, applications therefor, * * * trademarks, choses in action, and rights and claims of every character and description owing or belonging to * * * an enemy or ally of enemy.' (40 Stat. 1020.)"
 
 
 29
 This account is confirmed by the statement on the floor of the Senate by Senator Underwood, Chairman of the Senate Committee on Appropriations, which proposed the amendment. 56 Cong.Rec. 11430-31. That Congress was also concerned with the right to seize and sell trademarks in connection with the sale of business properties is plain. See 56 Cong.Rec. 11482, where one of the House managers explained the concurrence of the House conferees in the amendment as follows:
 
 
 30
 "The House concurred in these amendments, believing that they were simply carrying out the plain intent and spirit of the trading-with-the-enemy act, and that it does not change in any true sense the purpose and intent of such law, but clarifies and makes it plain. It would have been impossible, if the House should have held that the word `property' did not embrace trade-marks and patents, to have disposed of a great deal of property which is in the possession of the Alien Property Custodian and which had belonged to alien enemies, and which property for its value depended upon patent rights and trade-marks, and so forth."
 
 
 31
 In view of this history we cannot conclude that Congress intended to treat a naked trademark disassociated from a business as property which could be seized, in disregard of settled principles of trademark law. The implication is quite to the contrary. In other words, it seems plain that the intention was that the Government could get nothing more by seizure than could have been obtained by a private citizen in a voluntary transfer.
 
 
 32
 Appellants have not called our attention to any contrary authority. Our decision in Leitz involved a different situation and does not support their position here. In Leitz the trademark had been assigned by the German parent to its United States subsidiary along with the marketing business formerly carried on by the parent. The question before us was whether the United States company, no longer a subsidiary of the German company, its stock having been seized and sold by the Alien Property Custodian, could register the trademark as its owner. We upheld the validity of the assignment of the trademark to the United States company and the right of that company to register the mark with the U. S. Patent Office.
 
 
 33
 Since the Custodian's 1919 and 1921 seizures related only to a trademark in gross, he acquired no rights of property in the mark which would have entitled him to exclude its use by others. As in the case of any other person asserting the right to enjoin others from using a trademark, he had no right to prevent its use by others in the United States unless and until he had established his ownership rights in the mark through use in a United States business.[11] Neither he nor his assignee Chemical ever did so. It follows that the Attorney General did not acquire enforcible ownership rights in the trademark from Chemical and its successor corporation by virtue of the 1950-51 conveyance.
 
 
 Effect of the seizure of the stock of Zeiss New York, and the 1953 vesting order
 
 
 34
 It remains to consider what rights of ownership in the mark the Attorney General may have as a result of the Custodian's seizure of the stock of Zeiss New York in 1942 and the Attorney General's 1953 vesting order.
 
 
 35
 Unlike the situation before us in Leitz, Zeiss Jena had never assigned the trademark "Zeiss" to its subsidiary Zeiss New York. Nor do we perceive how ownership of the mark can otherwise be attributed to Zeiss New York, since it was found by the District Court not to be the exclusive distributor of Zeiss products.[12] Cf. Derenberg, Trademark Problems and the Import Trade, 49 T.M.R. 674, 685-86 (1959). Although the Government challenges this finding, asserting that Zeiss New York acted as exclusive distributor in every way except in legal form, we find the record insufficient to sustain this contention.[13] Zeiss Jena may have sold Zeiss products to other persons or firms in the United States only in occasional or single transactions, but the direct sale to other persons or firms in even a few instances negates an exclusive distributorship in Zeiss New York. And the fact that the German firm completely owned Zeiss New York (prior to the seizure of its stock by the Attorney General in 1942) made the transfer to the subsidiary of exclusive marketing rights, accompanied by an exclusive right to use the trademark, wholly unnecessary from the parent's standpoint, and thus improbable. In any case, notwithstanding the argument just referred to, we do not understand that the Government bases its claim of ownership of the trademark upon the fact that the Attorney General acquired ownership of all the stock of Zeiss New York in 1942.
 
 
 36
 The vesting order of 1953 undertook to vest in the Attorney General all trademarks "heretofore transferred or assigned to, or now owned by the Attorney General of the United States." But this order was also an attempt to transfer the trademark without an appurtenant business. To be sure, since the end of World War II the Attorney General has engaged in importing and selling Zeiss-marked products, but not as exclusive distributor, through his wholly-owned company, Zeiss New York.[14] The exclusive right to use the trademark in the United States did not belong to that business, however. It remained with the business, located in Germany, of selling German-produced Zeiss products to distributors in the United States.[15] As heretofore explained, such a business was not possible of seizure. We must conclude that the distributing business conducted by the Attorney General cannot be treated as the business to which the Zeiss trademark is appurtenant[16] and that his vesting order was ineffective as an attempt to transfer the trademark in gross.
 
 
 37
 The judgment of the District Court is therefore
 
 
 38
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Office of Alien Property Custodian established by Section 6 of the Trading With the Enemy Act of 1917, 40 Stat. 415, 50 U.S.C.A.Appendix, § 6, was abollished and its functions transferred to the Department of Justice by Executive Order No. 6694 effective on July 2, 1934. The Office of Alien Property Custodian was reestablished by Executive Order No. 9095, March 11, 1942, 7 Fed.Reg. 1971, 50 U.S.C.A.Appendix, § 6 note, and the Office was terminated and its functions transferred to the Attorney General by Executive Order No. 9788, October 14, 1946, 11 Fed.Reg. 11981, 50 U.S.C.A.Appendix, § 6 note
 
 
 [2]
 The authority to vest such stock is demonstrated by Silesian-American Corp. v. Clark, 1947, 332 U.S. 469, 68 S.Ct. 179, 92 L.Ed. 81
 
 
 [3]
 The parties agree that it is not relevant to a decision of this case that the United States has not entered into a treaty of peace, or of commerce, with East Germany and has not recognized its government
 
 
 [4]
 The Federal Supreme Court of West Germany has decided that Optik Jena is not entitled to use the trademark "Zeiss" on goods sold in West Germany. Similar rulings have been made in suits brought in other countries. A court in East Germany in a non-adversary proceeding has however upheld the right of Optik Jena to use the mark
 
 
 [5]
 Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 36 S.Ct. 357, 60 L. Ed. 713; United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Bourjois & Co. v. Katzel, 1923, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464; Roger & Gallet v. Janmarie, Inc., 1957, 245 F.2d 505, 44 CCPA 965; Avedis Zildjian Co. v. Fred Gretsch Mfg. Co., 2 Cir., 1958, 251 F.2d 530; Scandinavia Belting Co. v. Asbestos & Rubber Works, 2 Cir., 257 F. 937, certiorari denied 1919, 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186
 
 
 [6]
 In United States v. Chemical Foundation, 1926, 272 U.S. 1, 9, 47 S.Ct. 1, 4, 71 L.Ed. 131, it was conceded "that when seized the patents [a term used to include trademarks] belonged to enemy Germans and that they were lawfully taken over by the Custodian." The interests of the parties to that case of course did not demand that the lawfulness or effectiveness of the seizure be questioned
 
 
 [7]
 E. g., Andrew Jergens Co. v. Woodbury, Inc., D.C.Del.1921, 273 F. 952, affirmed 3 Cir., 1922, 279 F. 1016, certiorari denied, 1922, 260 U.S. 728, 43 S.Ct. 92, 67 L.Ed. 484; Coca-Cola Bottling Co. v. The Coca-Cola Co., D.C.Del.1920, 269 F. 796
 
 
 [8]
 The Government concedes that the mark could not be used on goods manufactured in the United States without deception of the public
 
 
 [9]
 While Chemical indicated by letter to the Bennett importing firm in the early 1920s that license fees would be payable with respect to Zeiss-marked imports, it never pressed this claim or received any payments
 
 
 [10]
 United States v. Chemical Foundation, 1926, 272 U.S. 1, 9-10, 47 S.Ct. 1, 71 L. Ed. 131; Silesian-American Corp. v. Clark, 1947, 332 U.S. 469, 475-76, 68 S. Ct. 179, 92 L.Ed. 81; Cities Service Co. v. McGrath, 1952, 342 U.S. 330, 333-34, 72 S.Ct. 334, 96 L.Ed. 359
 
 
 [11]
 See, e. g., Hanover Star Milling Co. v. Metcalf, 1916, 240 U.S. 403, 415-416, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 1918, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Armstrong Paint & Varnish Co. v. NuEnamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; rehearing denied, 1939, 305 U.S. 675, 59 S.Ct. 356, 83 L.Ed. 437; cf. Bourjois & Co. v. Katzel, 1923, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464; Roger & Gallet v. Janmarie, Inc., 1957, 245 F.2d 505, 44 CCPA 965
 
 
 [12]
 It has been held that the exclusive United States distributor of the goods of a foreign manufacturer acquires rights of ownership in the trademark affixed to those goods, where a right to use the mark for the term of the contract is granted (Scandinavia Belting Co. v. Asbestos & Rubber Works, 2 Cir., 257 F. 937, certiorari denied, 1919, 250 U.S. 644, 39 S.Ct. 494, 63 L.Ed. 1186; Avedis Zildjian Co. v. Fred Gretsch Mfg. Co., 2 Cir., 1958, 251 F.2d 530; De JurAmsco Corp. v. Janrus Camera, Inc., 1956, 16 Misc.2d 772, 155 N.Y.S.2d 123), or where the trademark itself with the appurtenant selling business is transferred (Bourjois & Co. v. Katzel, 1923, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464; Roger & Gallet v. Janmarie, Inc., 1957, 245 F.2d 505, 44 CCPA 965). Cf. Morris Corp. v. Hess Bros., Inc., 3 Cir., 1957, 243 F.2d 274, holding that an exclusive distributor of Swiss Omega watches which did not own the trademark qualifies as a "vendor" entitled to enforce a minimum price for Omega watches under the Pennsylvania Fair Trade statute
 
 
 [13]
 The Government's statement that no other United States firm imported Zeiss products directly from Zeiss Jena, only from other German sources, is contrary to the findings made. All the relevant evidence on this point appears not to be included in the Joint Appendix. See Rule 16 of the General Rules of this court, 28 U.S.C.A. In the circumstances we could not conclude that the finding is erroneous, even if the Joint Appendix indicated no support for the finding, which in our view is not the case
 
 
 [14]
 Under Section 45 of the Trade-Mark Act of 1946, 60 Stat. 443, 15 U.S.C.A. § 1127, Zeiss New York was a "related company" and under Section 5 of the Act, 60 Stat. 429, 15 U.S.C.A. § 1055, the Attorney General would have the benefit of whatever legitimate use of the mark Zeiss New York may have made
 
 
 [15]
 We intimate no view, of course, as to the interests or claims of Zeiss Jena, Optik Jena, or others. See fn. 4, above
 
 
 [16]
 Nor can the Attorney General gain any benefit from the fact that since June 28, 1951, he has not allowed Zeiss-marked goods to enter the United States without his permission. As we have held, he did not possess an ownership interest sufficient to permit him to do this