**D. M. & ANTIQUE IMPORT CORPO-
RATION, Plaintiff,**

v.

**ROYAL SAXE CORPORATION and
Chelsea Import Company, Inc.,
Defendants.**

No. 67 Civ. 4954.

United States District Court,
S. D. New York.

Nov. 14, 1969.

Supplemental Opinion April 22, 1970.

As Modified April 22, 1970.

---

Botein, Hays, Sklar & Herzberg, New York City, for plaintiff.

Baker & McKenzie, New York City, for defendants.

OPINION

LASKER, District Judge.

Plaintiff D. M. Antique Import Corporation ("D.M.") brings this motion for

**1264**

summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. D.M. seeks three forms of relief: first, a declaratory judgment that defendant Royal Saxe Corporation ("Royal Saxe") has no rights in certain registered trademarks and that the Patent Office should cancel those marks; second, an injunction restraining Royal Saxe and its American distributor, Chelsea Import Company, Inc. ("Chelsea") from interfering with D.M.'s china import business; and third, damages for allegedly false and fraudulent statements which Royal Saxe made in obtaining its registrations and for falsely designating the origin of goods it sells.

The crux of this dispute is whether Royal Saxe has the right to use on porcelain items either a mark consisting of crossed swords [1] ("the crossed swords mark") or another mark consisting of crossed swords within a shield ("the Prince de Saxe mark"). Also at issue is whether D.M. has the right to prevent Royal Saxe from barring D.M. from

---

1. There is no dispute that D. M. and Royal Saxe both use a trademark consisting of "crossed swords," and Royal Saxe does not contend, nor could it, that there is any significant difference between the two "crossed swords" marks. The marks are as follows:

**D.M.**

[A1101]

**R.S.**

---

These comments do not apply to the Prince de Saxe mark, which includes crossed swords superimposed on a heraldic shield, as follows:

[A1102]

dealing in merchandise bearing the former mark. It is important at the outset to note that D.M. does not claim or seek to establish that it is the owner of the crossed swords trademark.

D.M.'s position is that when Royal Saxe applied for and obtained registrations in these marks, it was not entitled to them because it was not the first to use them; that Royal Saxe knew it was not entitled to them and thus made false statements in order to support its application; that having obtained the registrations falsely, Royal Saxe then tried to invoke them to prevent D.M. from importing other East German-manufactured items which rightfully contained the mark; and that Royal Saxe failed to use its marks to the commercial extent necessary to preserve them.

Royal Saxe's defenses are that D.M. lacks trademark rights sufficient to give it standing to bring this action; that the real party in interest whose claims D.M. is asserting is an East German, state-owned enterprise, and thereby barred fom invoking any alleged rights by the Trading With the Enemy Act; and that its use of the registered marks is sufficient to withstand D.M.'s attempt to have them cancelled.

\* \* \*

The crossed swords mark is of significant value because for more than 250 years it has been associated with fine quality porcelain manufactured in Meissen, Germany. In 1710, August II, King of Poland and Elector of Saxony, established the Koenigliche (Royal) Porzellan Manufaktur Meissen ("K.P.") as a royal enterprise. In 1723 the tradition arose of affixing to the manufactured goods a mark consisting of crossed swords, which were also a part of August II's family coat of arms. That tradition has continued to the present. The enterprise was transferred to the State of Saxony in 1831, and has remained state-owned since then. In 1918 it was renamed Staatliche Porzellan Manufaktur ("S.P."). K.P. registered the crossed swords mark in the United States in 1895. In 1925, S.P. registered the same mark, but with a point appearing between the sword blades. S.P. continued to use the mark on china sold here prior to World War II, but the war caused an interruption in its sales and after 1945 it did not obtain a renewal of either the 1895 or 1925 registration.

The preceding facts are not contested. What is in dispute has to do with (a) the significance of the post-World War II history of Meissen china and (b) the extent and method of S.P.'s commercial activities in the United States.

The division of Germany left Meissen in the Eastern zone, and since 1950, following the establishment of the German Democratic Republic (East Germany) in 1949, the legend V.E.B. has preceded S.P.'s name to indicate that it is a "People's Owned Enterprise." However, the operating entity has gone on using the same plant that S.P. continuously used since 1865. Nevertheless, Royal Saxe (in its statement pursuant to Rule 9(g) of this court as to material facts which it alleges must be tried) asserts that "[i]t must be determined whether V.E.B.–S.P. is indeed the legal 'predecessor in interest' [sic; Royal Saxe apparently meant "successor in interest"] to \* \* \* [S.P.] from whom Plaintiff D.M. allegedly claims an interest." However, since the affidavit of Herbert Baessler, commercial director of V.E.B.–S.P., describes without qualification the line of succession which establishes that V.E.B.–S.P. is indeed the successor to S.P., and since defendant's affidavit in opposition contains literally no evidence on the subject, there clearly is no "genuine" issue as to any material fact on this point within the meaning of Rule 56(c). As to S.P.'s commercial activities in the United States, they are relevant only insofar as they demonstrate that D.M. has an interest in the marks that entitles it to protection. (See the discussion of D.M.'s standing under the Trade Mark Act, infra.) In affidavits in support of the motion, Natan Celnik, the president, and together with his wife

# 1266

the sole shareholder in D.M., and Herbert Baessler, commercial director of V.E.B.–S.P., state that since 1945 S.P. has sold $500,000 worth of goods bearing the crossed swords mark for export to the United States, and that D.M. has been the exclusive United States distributor of those goods since 1951. (Of course, the retail value of such merchandise is up to four times as great as the amount paid by D.M. as importer.) In its Rule 9(g) statement, Royal Saxe again asserts that the extent of these sales "must be determined." If by this claim Royal Saxe means to put the facts in dispute, it has not effectively done so, since, again, its affidavit in opposition to the motion contains not a shred of evidence as to D.M.'s commercial activities. "Vague and conclusory allegations" are not sufficient to meet the requirements of Rule 56. Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964). Furthermore, the only affidavit submitted by Royal Saxe in opposition to the motion is that of its attorney, who states:

"To my best information and belief, the historic pattern leading to these proceedings, as I have been advised by F.W. Methlow, President of the Royal Saxe Corporation, is * * *"

Such an affidavit, based as it admittedly is on second-hand information, does not meet the requirements of Rule 56(e) that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein". Accordingly, the facts are found to be as stated in the affidavits submitted by D.M.

Royal Saxe traces its post-World War II rights to the marks in question from Prince Ernst Heinrich von Sachsen, son of the last King of Saxony. Prince Ernst in 1952 applied to the United States Patent Office for registration of the mark consisting of his family shield. This mark, the Prince de Saxe mark, was registered by the Patent Office in December 1957 (No. 655,242). Prince Ernst as-

signed all rights in that mark to Royal Saxe in the same month. Registration No. 655,242 was abandoned, but Royal Saxe filed a new application for the registration of the Prince de Saxe mark in March 1962 and obtained registration in June 1964 (No. 772,301).

Royal Saxe first applied for the crossed swords mark in January 1962. The Patent Office granted Royal Saxe's application in October 1962 (No. 740,005). However, subsequent to the filing of this motion, the Patent Office cancelled No. 740,005 for failure to file affidavits of use under Section 8 of the Lanham Act. Royal Saxe has appealed that cancellation. In addition, S.P. has applied for re-registration of the crossed swords mark.

## I. STANDING

At the outset, it is necessary to dispose of Royal Saxe's contentions that D.M. has no standing to bring this action under either (1) 8 C.F.R. § 507.46 (a), a regulation issued under the authority of the Trading With the Enemy Act, 50 U.S.C. App. § 5(b), which authorizes regulations prohibiting acquisition, use or transfer of rights in property subject to United States jurisdiction in which a foreign country has an interest, or (2) the Trade Mark Act. 8 C.F.R. § 507.46(a) provides that:

"Any transaction, transfer, or the exercise of any right, power or privilege by or on behalf of or pursuant to the direction of Germany, or nationals of Germany with respect to any trademark or trade-name, or rights or interests therein or related thereto, which was in or registered in the United States on December 31, 1946, is prohibited, unless authorized by or on behalf of the Attorney General or the Director, Office of Alien Property."

Section (b) of the same regulation makes it clear that the above provision applies only to East Germany or East German nationals.

The substance of Royal Saxe's argument is that D.M. is asserting rights for

S.P. that the latter could not invoke itself, since it is situated in East Germany. The problem with this argument is that D.M. is asserting its *own* rights, and not S.P.'s. Royal Saxe cites Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892, 916 (S.D.N.Y.1968), for the proposition that D.M. is barred because it is S.P.'s assignee, but it offers no proof whatever that there has been any such assignment of the mark. D.M., however, submits proof to the contrary—an affidavit of the commercial director of V.E.B.–S.P., who states that V.E.B.–S.P. and no one else has applied for reregistration of the crossed swords mark. In addition, D.M.'s own unrefuted affidavits establish that it "is wholly separate and apart from S.P. and not connected with it in any way, except that it has contracted to, and buys merchandise from S.P. for resale in the United States." [2]

Since D.M. is found not to be asserting the rights of V.E.B.–S.P., nor to be its assignee, the provisions of 8 C.F.R. § 507.46(a) do not apply to it or bar it from bringing this action. This conclusion is fortified by the holding in G. H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499 (2d Cir. 1944), in which Judge Learned Hand held that the domestic importer of a French champagne the trademark of which was owned by the French manufacturer (France being at the time classified an "enemy" within the meaning of the Act) was not barred from suing to enjoin defendants from using the trademark.

In the absence of any showing that D.M. is acting "by or on behalf" of East German nationals—the type of transaction to which 8 C.F.R. § 507.46(a) applies—Royal Saxe cannot rely on that provision to bar this action. This conclusion renders irrelevant the question of whether or not V.E.B.–S.P. is the successor to S.P.—a contention which, for purposes of the Trading With the Enemy Act, Royal Saxe makes [3]—but, as we have observed above, the record before us appears clearly to indicate that it is the successor.

Royal Saxe also contends that a Vesting Order (No. 19256), by which the Attorney General purported to seize S.P.'s 1925 registered marks, establishes that S.P. is "precisely that type of organization which is prevented from exercising trademark rights in the United States." Apart from the fact that S.P. is not a party here, this very Vesting Order was invalidated by the Commissioner of Patents, Attorney-General v. von Sachsen, 114 U.S.P.Q. 445 (1957), a fact that Royal Saxe strangely omitted in its initial reference to the Vesting Order. Furthermore, Royal Saxe's position here as to the significance of the Vesting Order is utterly inconsistent with the position taken by its assignor, Prince Ernst Heinrich von Sachsen, who, in the litigation relating to the Vesting Order, took the position that the Attorney General had no rights in the mark.[4]

A case of particular interest in regard to the Vesting Order is Rogers v. Er-

2. Donald E. Nawi Reply Affidavit, p. 8
Natan Celnik Affidavit, paragraphs 1, 2
and 3.

3. Royal Saxe contends the opposite with respect to other aspects of this case—i. e., that V.E.B.–S.P. is *not* the successor to S.P. and therefore not the possessor of any trademark rights that S.P. had in these marks.

4. Exhibit A to Reply Affidavit of Donald E. Nawi: In support of his position, Prince Ernst also stated facts which appear totally to undermine the contention of Royal Saxe referred to above that

V.E.B.–S.P. may not be the true successor of S.P. He stated:
"It is further submitted that the opposition is unfounded because the Meissner Porzellan Manufaktur still exists as a legal entity under a state charter as a nationalized establishment as it did prior to 1941, as appears to be evidenced by the documentation submitted by Opponents [the Attorney General], particularly enclosures 3 and 4. There is nothing to prevent the management of the nationalized firm to oppose Applicant's registration, and it can lawfully do so if it so desires."

cona Camera Corp., 107 U.S.App.D.C. 295, 277 F.2d 94 (1960). There the court affirmed the grant of an injunction against an embargo on the importation and sale in the United States of goods manufactured in East Germany. As here, the plaintiffs were United States importers and distributors; the defendant was the Attorney General, who had purported to seize a trademark pursuant to a Vesting Order and thereby bar imports of the product in question. As in *von Sachsen,* supra, the court held that the seizure and Vesting Order were invalid because of principles of trademark law generally applicable. Although the court did not construe either 50 U.S.C. App. § 5(b), or 8 C.F.R. § 507.46(a), its decision is relevant here because the Attorney General himself did not invoke these provisions to bar the imports. That the Attorney General, who promulgated and has the responsibility for enforcing 8 C.F.R. § 507.46, did not even raise that section in his own defense in the *Ercona* suit is further telling evidence that it is inapplicable here.

■■■ Royal Saxe also argues that D.M. lacks standing under the Trademark Act. This is not so. Sections 14 and 24 of the Lanham Act [15 U.S.C. § 1064 ("Cancellation of Registrations") and 15 U.S.C. § 1092 ("Cancellation of marks on the Supplemental Register")] both entitle "any person" to file a cancellation petition when he "believes that he is or will be damaged by the registration of a mark * * *." While it is true that these sections apply to proceedings before the Commissioner of Patents, Section 37 of the Lanham Act (15 U.S.C. § 1119) provides that "[i]n any action involving a registered mark the court may determine the right to registration [and] order the cancellation of registrations * * *." This provision has been held to be concurrent with the authority of the Patent Office to conduct cancellation proceedings, and also to apply where the plaintiff lacks a registered mark but the defendant possesses one—precisely the case here. Durox

Company v. Duron Paint Mfg. Co., 320 F.2d 882, 886–887 (4th Cir. 1963); Simmonds Aerocessories Limited v. Elastic Stop Nut Corp., 257 F.2d 485, 491 (3d Cir. 1958). But see Universal Sewing Machine Co. v. Standard Sewing Equipment Corp., 185 F.Supp. 257, 260 (S.D. N.Y.1960). Furthermore, D.M. also seeks relief under 15 U.S.C.A. § 1125(a), a basis for jurisdiction here, which creates civil liability to "any person who believes that he is or is likely to be damaged by the use of any * * * false description or representation." The broad use of the words "any person" rather than a narrower designation appears clearly to reflect a legislative purpose to protect competitive users of trademarks whether or not they are owners of the mark. This being the case, and D.M. clearly being a competitor of Royal Saxe, D.M. has standing under the statute, according to the rule of Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968), that

"* * * when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision. See Alton R. Co. v. United States, 315 U.S. 15, 19, 62 S.Ct. 432, 435, 86 L.Ed. 586 (1942); City of Chicago v. Atchison, T. & S. F. R. Co., 357 U.S. 77, 83, 78 S.Ct. 1063, 1066, 2 L.Ed.2d 1174 (1958)."

See also Iding v. Anaston, 266 F.Supp. 1015 (N.D.Ill.1967), and Apex Beauty Products Mfg. Corp. v. Brown Shoe Co., Inc., 209 F.Supp. 73 (S.D.N.Y.1962).

## II. DECLARATORY JUDGMENT

■■■ D.M. seeks a declaratory judgment that (1) Royal Saxe's registrations in both the crossed swords and Prince de Saxe marks are invalid and should be cancelled because Royal Saxe did not make legally sufficient use of them and (2) that Royal Saxe has "no rights" in the crossed swords mark because it was

not the first to use it.[5] I deal with these contentions separately.

As will be seen below, I find merit in D.M.'s contentions as to (1) the invalidity of Royal Saxe's registration of the crossed swords mark and (2) its claim that Royal Saxe has no rights in the crossed swords mark, but I do not find for D.M. as to the question of the Prince de Saxe mark. I have deliberately stated that I do not "find for" D.M. rather than that I "find no merit" as to D.M.'s contention that the Prince de Saxe mark is invalid, because I find it unnecessary to make any such determination. My reason for holding against D.M. as to the Prince de Saxe mark depends not on the fact that Royal Saxe may not have used it sufficiently to acquire or maintain its rights, but rather that in viewing the Prince de Saxe mark in comparison with the crossed swords mark I do not find that there is the requisite confusion between them. Although among its regalia of aristocracy the Prince de Saxe mark includes the crossed swords, nevertheless the imposition of the crossed swords on the heraldic shield of the Prince de Saxe mark creates visually a substantially different impression from the mark of the crossed swords alone. Since I do not find that the Prince de Saxe mark would be confusing to the average viewer in comparison with the crossed swords mark (and certainly not to the sophisticated buyer of china who, as the plaintiff itself asserts, has come to know the Meissen mark very well over the years), I determine that D.M. has not been and will not be damaged by its continued use by Royal Saxe; and if D.M. has not and will not be damaged, it does not have standing as "any person who believes that he is or will be damaged by the registration of a mark" within the meaning of 15 U.S.C. § 1064.[6]

\* \* \*

As the Court of Appeals for this Circuit has said:

"The right to a particular mark grows out of its use, not its mere adoption, and is not the subject of property except in connection with an existing business." George W. Luft Co., Inc. v. Zande Cosmetic Co., Inc., et al., 142 F.2d 536, 541 (1944).

The pertinent principles are summarized at 3 Callmann, Unfair Competition, Trademarks and Monopolies, §§ 76.-2(d), (g), (k), (3d ed. 1969):

The use of the trademark must be deliberate and continuous, though not necessarily extensive; it must not be sporadic \* \* \* casual, fortuitous, experimental, or transitory \* \* \* Whether the use was experimental is important only if the experiment proves unsuccessful \* \* \* Although evidence of sales is generally persuasive and in most cases the basis if not the sole evidence relied upon to es-

---

5. The fact that the Patent Office has already cancelled Royal Saxe's registered trademark No. 740,005 (the crossed swords mark) is not dispositive of the issue of Royal Saxe's right in that mark because its common law rights are not affected.

> Though a trademark may be valid at common law, it may not be registered unless and until there is full compliance with the provision of the applicable statute \* \* \* [Conversely], (t)he right to a trademark at common law is not adversely affected by the cancellation of its registration \* \* \* Registration is a form of use \* \* \*; Registration is, however, not the entire use; therefore, cancellation of a registered trademark does not preclude the possibility of another use of the deregistered mark. 3 Callmann, Unfair Competition, Trademarks and Monopolies, § 86.1(b), pp. 1060–1065 (3d ed. 1969). See also Skil-Craft Corporation v. M. Lober & Associates, 138 F.Supp. 313 (S.D.N.Y.1956).

6. While the statute gives the right to sue to a person who "believes that he is or will be damaged," it is clear that to prevail in such a suit or even, if there is a question, to establish his standing, there must be a real possibility of his being damaged and not the mere assertion of a belief. See Ye Olde Tavern Cheese Products, Inc. v. Planters Peanuts Division, 261 F.Supp. 200, 208 (N.D.Ill.1966); Prince Dog and Cat Food Co. v. Central Nebraska Packing Co., 305 F.2d 904, 906, 49 CCPA 1328 (1962).

tablish use, sales are not the *sine qua non* of use sufficient to prove appropriation * * * Whether the use was casual can be determined only when the use, after a brief period, has been discontinued * * * The mark must be so used that it comes to the attention of wholesale or retail purchasers in association with, and as a means of identifying, the product. (Footnotes omitted.) (pp. 285–288)

\* \* \* \* \* \*

Trademark use must be bona fide and more substantial than a pro forma use; for example, a single sale, solely purposed at laying the foundation for a claim of use, cannot be seriously considered. (p. 292)

\* \* \* \* \* \*

The right to register * * * is conditioned * * * upon [the registrant's] actual use; * * * While actual use determines the right to register, registration carries with it an obligation of continued use. (p. 297)

D.M. in its affidavits has established the following facts concerning these issues with respect to the crossed swords mark which have not been controverted by Royal Saxe:

1. It has been in use in the United States since before 1900, on S.P.'s Meissen china. Since 1945 S.P. has shipped $500,000 worth of goods bearing that mark to the United States.

2. The only transaction in which Royal Saxe engaged, involving goods bearing this mark, was a sale to defendant Chelsea in February 1962. The sales price was $1,291.-68. The actual shipment took place in 1963.[7]

3. Royal Saxe obtained Registration No. 740,005 for the crossed swords mark in October 1962.

If the approximately $1300 worth of sales by Royal Saxe in items bearing the crossed swords mark do not constitute sufficient use, then it is appropriate to grant summary judgment declaring that the cancellation of Royal Saxe's registration of that mark was properly granted, since there is no genuine issue of material fact with respect to the extent of the use of the mark, Johnson v. Nationwide Mutual Ins. Co., 276 F.2d 574 (4th Cir. 1960), and since there is a real and substantial controversy between the parties admitting of specific relief through a decree of a conclusive character, Jno. T. McCoy, Inc. v. Schuster, 44 F.Supp. 499 (S.D.N.Y.1942); Federal Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202. Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

Applying these principles to the facts in this case, it is evident, as the discussion below demonstrates, that Royal Saxe's "transitory and minimal use was clearly not sufficient to give it any priority over * * * [S.P.'s] long continued and notorious use." Merry Hull & Co. v. Hi-Line Co., 243 F.Supp. 45, 52 (S.D.N.Y.1965) (Ryan, C. J.). In Academy Award Products v. Bulova Watch Co., 90 F.Supp. 12 (S.D.N.Y. 1950), the court held that the plaintiff was not entitled to a preliminary injunction restraining defendant from marketing the same type of product, with the same name, as plaintiff had registered, when plaintiff made only one sale of the item in question. Here, in addition to the deposition testimony of Mr. Marschall, the principal of defendant Chelsea, showing the feeble results from the one

---

7. Royal Saxe admits that "the sales of Royal Saxe china in the United States has [sic] been limited to those sales made by Chelsea Import Corporation during the 1963–1967 period." Chelsea's president, Mr. Marschall, testified at his deposition, "I haven't bought from Royal Saxe since 1963. I bought one rotten order and I was finished. I was sorry I ever bought it. I could not sell it. It took me five years to sell the darned thing."

sale that Royal Saxe did make (see footnote 7 supra), there is an absence of any other proof of commercial activity, such as telephone listings, advertising, reportable income from sales, and attempts to sell, or sales to other retailers, including department stores. Indeed, the deposition testimony of defendant Royal Saxe's principal, Dr. Methlow, establishes the "transitory and minimal" use of the mark by Royal Saxe. *Merry Hull*, supra, 243 F.Supp. at 52. This makes it impossible to accept Royal Saxe's uncorroborated assertion that "since about 1948 there has been a continual pattern of activity in Royal Saxe china." To drive the last nail in the coffin, D.M.'s uncontradicted evidence establishes that Royal Saxe's bank account was closed in December 1967, and that its only present assets are samples valued on Royal Saxe's balance sheets at approximately $1,000 but with no present market value at all. Under the circumstances, D.M. is accordingly entitled to a declaration that the Commissioner's cancellation of No. 740,005, the crossed swords mark, was proper.

Up to this point we have been dealing with D.M.'s claims as to the invalidity of Royal Saxe's *registered* marks. D.M. also seeks a declaratory judgment that Royal Saxe is not the owner of the crossed swords mark and "has no [common law] rights" in that mark because it was not the first to use it. The governing principles as to common law rights of trademark are summarized by Callmann:

> The common-law right of a trade-mark refers to the ownership of the mark, which includes the right to use the mark and the right to protection against its infringement by others. 4 Callmann, The Law of Unfair Competition and Trade-Marks, § 97.3(c) (3), p. 2080 (2d ed. 1950).

> One who lays claim to the exclusive ownership of the trademark in question must prove that he was the first to have used it as a mark in connection with similar articles * * * "Use by another before, at the same place, or near enough to start a similar right, would prevent the use from showing such origin."

> \* \* \* \* \* \*

> The first user, who owns the business to which the trademark refers and the goodwill it symbolizes, becomes the trademark owner. First user does not refer to the party who was prior in time, but "first in the specific trade." * * * The legitimate successor to the first user's business stands in the latter's shoes, and his rights will date from the first use. 3 Callmann, The Law of Unfair Competition, Trademarks, and Monopolies, §§ 76.2(c), (h), pp. 284–285, 294–295 (3d ed. 1969). (Footnotes omitted.)

As indicated above, it is an undisputed fact that the crossed swords mark has been in use in the United States since before 1900 on Meissen china produced by S.P. It is also uncontested that Royal Saxe's first use of this mark was in 1962. It is therefore evident that, since Royal Saxe was not the first to use the crossed swords mark, it lacks the exclusive right to use it. Sweetarts v. Sunline, Inc., 380 F.2d 923, 926 (8th Cir. 1967); 3 Callmann, supra, § 76.1.

As between conflicting claimants, the prior user has a superior right to continue its use. Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2d Cir. 1962); United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 100, 39 S.Ct. 48, 63 L.Ed. 141 (1918). In this case, however, D.M., though not claiming superior rights in the mark for itself, need not rely solely on whatever rights S.P. may have in that mark in order to obtain a declaration that Royal Saxe has no rights of its own. This is so because the court, in addition to its prior conclusion that Royal Saxe has not been conducting its business to an extent sufficient to retain its statutory registration in either mark, further finds that its business inactivity warrants a declaration that it has no common law rights in the crossed swords mark.

"As property rights subject to 'ownership,' trademarks are sui generis * * [O]wnership grows out of and depends upon the continuance of use * * *." Alfred Dunhill of London v. Dunhill Tailored Clothes, 293 F.2d 685, 692, 49 CCPA 730 (1961).

"There can be no doubt that ownership of a United States trademark can 'exist only as an appurtenance to manufacturing or marketing business conducted in the United States in which [the] mark is used." R.C.W., Supervisor, Inc. v. Cuban Tobacco Company, 220 F.Supp. 453 (S.D.N.Y.1963) (Bryan, J.). (Citations omitted.)

" * * * the right to a particular mark grows out of its use, not its mere adoption * * * and it is not the subject of property except in connection with an existing business." United Drug Co. v. Theodore Rectanus Co., supra, 248 U.S. at 97, 39 S.Ct. at 51.

Since Royal Saxe does not even deny D.M.'s Rule 9G statement that "Royal Saxe is a corporate shell and has not been active for several years," it is clear that Royal Saxe is not using the crossed swords mark and therefore possesses no common law rights in it.

### III. FRAUD

D.M. next maintains that Royal Saxe procured the registrations for both marks involved here by means of false and fraudulent representations, and should therefore be held liable under Section 38 of the Lanham Act (15 U.S. C.A. § 1120). That provision reads:

Any person who shall procure registration in the Patent Office of a mark by a false or fraudulent declaration or representation * * * or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."

The alleged falsity consists of the following:

A. *Crossed Swords Mark:* Royal Saxe's sworn application to register this mark states that it was first used by Royal Saxe on October 20, 1952, was first used in commerce on November 6, 1952, and was then (January 16, 1962) in use in such commerce, whereas Royal Saxe's president, Dr. Methlow, stated on deposition that Royal Saxe made no use of the mark until February 26, 1962.

B. *Prince de Saxe Mark:* Royal Saxe's sworn application to register this mark states that it was then (March 26, 1962) in use in commerce, whereas Dr. Methlow testified at his deposition that the last time any goods bearing this trademark had been sold was in 1958.[8]

Clearly, there is an inconsistency within each of these two versions. Royal Saxe neither disputes the contradiction nor clarifies it. Nevertheless, even assuming the application statements to be incorrect, their mere "falsity" does not entitle D.M. to recovery under 15 U.S.C.A. § 1120. That section has been interpreted to require that the plaintiff's injuries result from the use of the mark while falsely registered, as opposed to "an injury resulting from the false declaration solely." Landstrom v. Thorpe, 189 F.2d 46, 50, 26 A.L.R.2d 1170 (8th Cir. 1951). Here, of course, the very facts on which plaintiff relies make it doubtful that there was any such use. But even if this were not so, D.M.'s failure to furnish any proof whatsoever as to damage it has suffered is fatal to its request for relief under this branch of the motion. Without proof as to damages, no relief could be granted even after trial, and of course cannot be

8. In its complaint, D. M. stated that Dr. Methlow's declarations, in the applications for registration of the two marks, that "to the best of his knowledge and belief no other person, firm, corporation or association has the right to use" these marks constituted an additional falsehood. However, in the motion for summary judgment, D. M. has dropped this contention.

granted on a motion for summary judgment.

## IV. INJUNCTIVE RELIEF

Finally, D.M. seeks to enjoin Royal Saxe from using in commerce any articles of china or porcelain or attaching any trademark which may cause consumers to believe that the goods originate in Meissen or that Royal Saxe is affiliated with D.M. or S.P. It also seeks to enjoin Royal Saxe from interfering with D.M.'s importation or other business with respect to items bearing the crossed swords mark.

Insofar as this branch of D.M.'s motion envisions an injunction against use of the Prince de Saxe mark, it is denied for the reason stated above in relation to the application for a declaratory judgment—i. e., that the requisite confusion between the marks does not exist.

D.M.'s claim for injunctive relief is based on Section 43(a) of the Lanham Act (15 U.S.C.A. § 1125), which reads in relevant part:

Any person who shall affix, * * * or use in connection with any goods * * * a false designation of origin, or any false description or representation, including * * * symbols tending falsely to describe or represent the same, and shall cause such goods * * * to enter into commerce, * * * shall be liable to a civil action by any person * * * who believes that he is or is likely to be damaged by the use of any such false description or representation.

In view of the facts set forth in the discussion above, I find that D.M. is entitled to such relief as to the crossed swords mark. The crossed swords marks used by D.M. and Royal Saxe are practically identical. There is no need to repeat in detail here the items of evidence enumerated above which firmly establish that the first user of that mark was the predecessor in a direct line of V.E.B.–S.P., whose goods D.M. exclusively distributes in this country, nor that Royal Saxe attempted improperly to register the mark as its own in this country. Furthermore, the record before me shows that Royal Saxe has, by letters from its attorneys, attempted to cause the Bureau of Customs to "effect detention and seizure of the * * * products of * * * [V.E.B.–S.P.]." While the Bureau has not so far taken the action requested by Royal Saxe, nevertheless the threat of such action continues unwarrantedly to cloud D.M.'s right to the use of the mark and to import Meissen goods without interference.

Injunctive relief is clearly appropriate in the circumstances. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694 (2d Cir. 1961); Safeway Stores, Inc. v. Safeway Properties, Inc., supra. In *Safeway*, as here, as Judge Waterman stated (307 F.2d at 497):

"The single issue which divides the parties is whether the plaintiff's use of the term 'Safeway' as a trademark entitles it to a preliminary injunction against the defendant's use of the same term in the conduct of defendant's business. The keystone in that portion of the law of unfair competition which relates to trademarks is the avoidance of confusion in the minds of the buying public."

Judge Waterman then quoted at length from Judge Learned Hand's beguiling exposition of the law in Yale Elec. Corp. v. Robertson, 26 F.2d 972, 973, 974 (2d Cir. 1928):

"The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, though it assumes many guises. * * *

"However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposi-

tion by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful."

For the reasons stated above the motion for summary judgment for a declaratory judgment is granted as to the crossed swords mark and denied as to the Prince de Saxe mark; the motion for summary judgment as to damages is denied; the motion for injunctive relief as to the crossed swords mark is granted, but denied as to the Prince de Saxe mark.

Settle order on notice.

### SUPPLEMENTAL OPINION

Plaintiff moves for reargument of so much of the decision of this court of November 14, 1969 as (a) refused to grant summary judgment to plaintiff with respect to the Prince de Saxe mark and (b) refused to grant summary judgment to plaintiff with respect to plaintiff's right to damages from defendants' unlawful acts. The motion is granted.

Dual relief was originally requested with regard to the Prince de Saxe mark: a declaration that defendants had no rights in or to the use of the mark, and an injunction in connection with the use of the mark. The branch of the original motion as to the Prince de Saxe mark was denied because it was my view that the requisite confusion did not exist between the Prince de Saxe mark and the "crossed swords" mark on Meissen china. Since I did not find that the Prince de Saxe mark would be confusing to the average viewer in comparison with the crossed swords mark, it appeared to

me that D.M. would not be damaged by its continued use by Royal Saxe, and if this were true, that the plaintiff did not have standing as "any person who believes that he is or will be damaged by the registration of a mark" within the meaning of 15 U.S.C. § 1064.

On the motion for reargument, the plaintiff has produced a document from the Patent Office stating in relevant part:

"Upon examination, registration is refused because the mark, as applied to applicant's goods, so resembles the mark cited below as to be likely to cause confusion, mistake or deception:

Registration No. 740,005

Registration No. 772,301"

The registrations referred to in the excerpt above are the marks in question on this motion.

While the court is not bound by the determination of the Patent Office, nevertheless the expertise of the trademark examiners does entitle their views to respectful consideration. Accordingly, I now find that the requisite confusion does exist between the Prince de Saxe mark and the mark on Meissen china, so that plaintiff's belief that it may be damaged by the continued use by Royal Saxe of the Prince de Saxe mark is accompanied by the requisite showing of a likelihood of damage. Plaintiff does have standing under 15 U.S.C. § 1064.

Since I am now holding that plaintiff does have standing, it becomes appropriate to review the prior denial of declaratory relief, which was not considered on the merits in my previous opinion. Plaintiff is entitled to a declaratory judgment that Royal Saxe has no rights in the Prince de Saxe mark because Royal Saxe never made sufficient use of that mark to warrant its continued registration. The first sale in the United States of items bearing the Prince de Saxe mark took place in October 1952, and was made solely for application purposes. The "buyer" was a

personal friend of Royal Saxe's president. No money was paid for the goods. A second shipment involving goods worth $300–$400 took place in 1958. The "buyer", Midwest Overseas Trading Corporation, never paid Royal Saxe for these goods either. No other sales were made of items containing the Prince de Saxe mark, for which Royal Saxe obtained Registration No. 772,301 on June 30, 1964. It is clear from these facts and from the principles concerning the requirement of trademark use (discussed in my previous opinion in this case) that Royal Saxe did not make the requisite use of the Prince de Saxe mark to maintain its registration. For that reason, Registration No. 772,301 should be cancelled.

As to injunctive relief, in affidavits and exhibits attached to the original motion in this case plaintiff established that Royal Saxe's adoption of the Prince de Saxe mark was accomplished by false and misleading conduct. For example, in its application to register that mark, Royal Saxe falsely stated that the Prince de Saxe mark was then (March 26, 1964) in use, whereas Dr. Methlow, president of Royal Saxe, later testified that its last use in commerce had been in 1958. In addition, Royal Saxe prepared a sales brochure which made it clear that items bearing the Prince de Saxe mark would be marketed as though they were produced in Saxony, which was not the case. Meissen china, however, with which the Prince de Saxe mark could be associated, is produced in Saxony. Under these circumstances, D.M. is entitled to injunctive relief against future deceptive use of the Prince de Saxe mark.

Finally, on this motion for reargument D.M. requests reconsideration of the court's refusal to grant summary judgment with respect to plaintiff's right to damages from defendants' unlawful acts. I previously declined to rule in favor of plaintiff as to damages because the plaintiff had failed to furnish any proof whatever that it had been damaged. Plaintiff now points out that its request for relief never involved the granting of actual damages, but only a declaration that it was entitled to prove damages.

A reexamination of the original motion papers, assisted by plaintiff's present clarification, indicates that plaintiff's position is properly taken, although the original motion papers contained a source of confusion in requesting relief "awarding plaintiff damages it has sustained * * *" In any event, in the light of the clarification provided by the papers presented on the motion for reargument, the request for such limited declaration as to damages is granted.