**BUITONI FOODS CORPORATION,**
**Plaintiff,**

v.

**GIO. BUTON & C. S.p.A., Defendant.**

**Civ. A. No. 79 C 2780.**

United States District Court,
E. D. New York.

Nov. 3, 1981.

sode." *State v. Hegstrom,* 401 So.2d 1343, 1346 (Fla.1981) (emphasis added).

Guy W. Shoup, Eliot S. Gerber, Barbara A. Larsen, Wyatt, Gerber, Shoup, Scobey & Badie, New York City, for plaintiff.

G. Franklin Rothwell, Bernard, Rothwell, Brown, P. C., Washington, D. C., Stuart B. Fisher, Smith, Steibel, Alexander & Saskor, P. C., New York City, for defendant.

## MEMORANDUM & ORDER

PLATT, District Judge.

In this case plaintiff sues for trademark infringement under 15 U.S.C. § 1114 (FIRST CLAIM), common law trademark infringement (SECOND CLAIM), and unfair competition, namely, dilution under § 368(d) of the General Business Law of the State of New York (THIRD CLAIM). Plaintiff also seeks to review a ruling of United States Trademark Trial and Appeal Board ("TTAB") made under 15 U.S.C. § 1071(b) (FOURTH CLAIM).

Defendant has asserted counterclaims for common law trademark infringement (FIRST COUNTERCLAIM), unfair competition under 15 U.S.C. § 1125(a) (SECOND COUNTERCLAIM), common law unfair competition (SECOND COUNTERCLAIM), and unfair competition under § 368(d) of the New York General Business Law (THIRD COUNTERCLAIM).

The parties redefined the issues for determination at the trial (Tr. 208–209) as follows:

1.) "The fundamental issue is one of *use* and the public perception of that use.

Trademark law in the United States is based on use and public perception. That issue of use is further broken down to the two issues of *nature* of use (primary vs. incidental use of a trademark) and the *extent* of use.

The relevant issues of trademark law are nature of use, extent of use, use of a family name, and whether the BUITONI trademark, a famous trademark for Italian style food, is sufficiently strong so that it may be freely used on a closely related product—table wine (BPTB, p.2)."

\* \* \* \* \* \*

2.) "The most important issue before this Court is the proper wording of a decree to protect the parties and the public in

their different trademarks and trade names asserted, (i) the Italian family name BUITONI and (ii) a name derived from a French name, BUTON (BPTB, p.4)."

\* \* \* \* \* \*

"The issue is: which of the trademarks should be protected with respect to *table* wine,

(i) the trademark BUITONI, which is used as the primary trademark on Buitoni products, whether they be food or table wine, or

(ii) the trademark BUTON, used incidentally on brandy and aperitif and never used on table wine (BPTB, p.8)."

\* \* \* \* \* \*

3.) "There is also the procedural necessity that the decision of the Trademark Trial and Appeal Board be reversed or modified and that an order be entered directing the maintenance of Buitoni's trademark registration for BUITONI wines or modifying it, as appropriate (BPTB, p.5)."

\* \* \* \* \* \*

"Thus, in this action, in addition to reversing or affirming the decision of the Trademark Trial and Appeal Board [this Court] may adjudge ". . . such other matter as the issues in the proceedings require, *as the facts in the case may appear*", 15 U.S.C. § 1071(b)(1) (BPTB, Appendix, p. 3)."

The parties have stipulated to the following facts:

1. Buitoni Foods Corporation is a New York corporation and its principal place of business, including its manufacturing plant, is at 450 Huyler Street, South Hackensack, New Jersey; it has offices in other states.

2. Buitoni Foods parent corporation is IBP Industrie Buitoni Perugina S.p.A. located at Via Cortonese 4, 06100 Perugia, Italy.

3A. Buitoni Foods owns Reg. No. 740,130 for BUITONI for macaroni, spaghetti, egg noodles, meat sauce, macaroni products, meatless sauce for macaroni products, clam sauce, canned tomatoes, rice, olive oil, tomato paste and tripe, spaghetti and meatballs in cans, mushroom sauce, meatless pizza sauce, bottled roasted peppers, frozen ravioli, frozen pizza, grated cheese and dehydrated soup.

3B. Buitoni Foods also owns Registration No. 884,225 for the mark BUITONI for macaroni, spaghetti, egg noodles, meat sauce for macaroni products, meatless sauce for macaroni products, clam sauce, spaghetti and meatballs in cans, mushroom sauce, meatless pizza sauce, frozen ravioli, frozen pizza and grated cheese.

3C. Buitoni Foods other trademark registration No. 1,040,711, is a subject of this controversy.

4. The first use of the mark BUITONI in connection with the food products is stated to be February 19th, 1941 on Reg. No. 740,-130 and October 30, 1962 on Reg. No. 884,-225.

5. In 1973 the Renfield Corporation a major wine importer, approached Buitoni Foods and requested permission to use the trademark BUITONI in connection with wines.

6. Buitoni Foods licensed use of the mark BUITONI to Renfield Corporation by an agreement dated November 9, 1973.

7. The mark BUITONI was first used in commerce in connection with wines in May of 1975, and first used in intrastate commerce on December 24, 1974.

8. On October 6, 1975, Buitoni filed an application to register BUITONI for use in connection with wines. This registration was issued June 1, 1976.

9. The total dollar volume of Buitoni wines sold from 1975–1978 was approximately $651,741 worth.

10. The Buitoni registration for wines issued on June 1, 1976 as Registration No. 1,040,711.

11. On May 12, 1977, Gio. Buton C.S.p.A. filed a petition to cancel Plaintiff's Registration No. 1,040,711 in the United States Patent and Trademark Office because in Buton's view Buitoni's use of its mark on wine was likely to cause confusion in view of Buton's use of BUTON on alcoholic beverages.

12. A cancellation proceeding was declared by the Trademark Trial and Appeal Board on June 2, 1977 under Cancellation No. 11,-589.

13. The United States Patent and Trademark Office Trademark Trial and Appeal Board ordered cancellation of Buitoni's Registration No. 1,040,711 on August 31, 1979 on the grounds that "Registrant's [Buitoni's] mark 'BUITONI' so resembles petitioner's [Buton's] previously used mark 'BUTON' as to be likely, when applied to wines, to cause confusion, or to cause mistake or to deceive". Opinion of Trademark Trial and Appeal Board at 17.

14. The TTAB made the following findings:

A. "Petitioner (Buton) is engaged in the business of marketing brandy, liqueurs, and aperitif wines bearing the designation "BUTON", which Petitioner (Buton) uses both as a trademark and as a salient feature of its trade name, Gio. Buton C.S.p.A. (Opinion, p. 3)

B. "Petitioner's (Buton's) goods bearing the designation "BUTON" have been sold in commerce with the United States since at least as early as 1963 (*Id.*).

C. "The products are advertised in the United States on radio and television and through the print media. [Buton's] expenditures for advertising its "BUTON" products in the United States for the ten years prior to May, 1978 totalled approximately $50,000; sales thereof for the same 10-year period amounted to $490,000." (*Id.*)

D. ". . . . . . Petitioner (Buton) made continuous commercial use in the United States of the designation "BUTON" employed in the manner of the trademark, for various alcoholic beverages, including vermouth, for some twelve years prior to Respondent's (Buitoni's) first use of the mark "BUITONI" and design for wine, and the Petitioner (Buton) thereby acquired valuable rights in its said designation subsequent (pre-sumably) to Respondent's (Buitoni's) establishment of rights in the mark "BUITONI" for pasta and other assorted food products prior to Respondent's (Buitoni's) expansion of its business under the mark "BUITONI" and design to wine. In view thereof, and since Respondent (Buitoni) has in any event failed to introduce any evidence to show that its expansion from pasta and other food products to wines was a natural one, we conclude that Petitioner (Buton) has priority of use "(Opinion at 12).

E. ". . . . . it is clear that Petitioner (Buton) possesses a proprietary right in its mark sufficient to preclude the registration by a subsequent user of the same or similar mark for like or related goods." (Opinion at 15)

F. "For the foregoing reasons, we conclude that Respondent's (Buitoni's) mark "BUITONI" and design so resembles Petitioner's (Buton's) previously used mark "BUTON" as to be likely, when applied to wines, to cause confusion or to cause mistake or to deceive." Opinion at 17.

15. There is at present no written agreement between Buitoni Foods and Foreign Brands, Inc. to sell wines under the trademark BUITONI.

16. There is at present no written agreement between Foreign Brands, Inc. and any Italian or other wine manufacturer to sell wines under the trademark BUITONI.

17. There is at present no written agreement between Buitoni Foods and any Italian or other wine manufacturer to sell wines under the trademark BUITONI.

18. It is the obligation of an importer of foreign alcoholic beverages to obtain Certificate of Label approvals from the Federal Bureau of Alcohol, Tobacco and Firearms.

19. Foreign Brands has not yet applied for or obtained such Certificate of Label Approvals from the Federal Bureau of Alcohol, Tobacco and Firearms for labels for wine bearing the BUITONI trademark.

20. Foreign Brands is currently engaged in bankruptcy proceedings. The Petition was filed on October 22, 1979 under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. It is entitled In re Foreign Brands, Inc., I.D. # 79 Bkcy 10070. The proceeding has not been concluded and as of May 29, 1980, was expected by Manus Gass, President of Foreign Brands, to take another 60–90 days.

21. When wine was in the past sold under the BUITONI trademark (1975–1977), wine was advertised on the containers for Buitoni foods and in conjunction with Buitoni food.

22. Buitoni Foods' advertising with respect to its food products is directed to the American consumer market.

23. Buitoni Foods does not intend to await the outcome of this litigation before beginning importation of wines under the Buitoni trademark.

24. Buitoni wine is to be sold in grocery stores, retail liquor and wine stores, bars and restaurants.

25. Gio. Buton C.S.p.A. is an Italian corporation founded in 1820 in Italy by a Frenchman named Jean Bouton who changed his name to Giovanni Buton.

26. Gio. Buton was the last living Buton family member. The exact date of his death is unknown but it was in the late 19th century.

27. According to Il Mondo, an Italian economic publication, Gio. Buton & C.S.p.A. is currently the third largest Italian beverage manufacturer.

28. Gio. Buton was granted a U.S. Design Patent No. 38139 on July 31st, 1906 for the ornamental design for a bottle by the U.S. Patent Office.

29. Sale of alcoholic beverages in the United States was illegal during the Prohibition which was from 1919 to 1933.

30. From 1941 to 1944 Italy and the United States were at war during World War II.

31. In 1970 Paterno Imports, Inc. became Gio. Buton's importer, for VECCHIA ROMAGNA brandy only. Paterno was the importer of VECCHIA ROMAGNA brandy from 1970 to 1976.

32. In 1976 Gio. Buton C.S.p.A. entered into an agreement with Great Vintners International, Limited, per Mr. Lionel Braun, by which Great Vintners became Buton's importer. This relationship continued until the end of 1979.

33. In 1978 Sydney Frank Imports d/b/a Great Vintners became Gio. Buton's importer. The products imported by Sydney Frank, during 1978 doing business as Great Vintners, were as follows:

a) BUTON AMORETTO

b) BUTON VERMOUTH

c) BUTON VECCHIA ROMAGNA (Brandy)

d) WALNETTA

34. At the beginning of 1979 Star imports doing business as great Vintners succeeded Sydney Frank. The products imported by Star Liquor Imports, during 1979 doing business as Great Vintners, were:

a) Buton Amaretto Liqueur

b) Buton Vecchia Romagna Brandy

c) Buton Walnetta Liquor

d) Buton Rosso Antico Aperitif

e) Buton Rosso Vermouth

According to the affidavit of the Star Office Manager, Star also imported Buton Rosso Vermouth, Buton Bianco Vermouth and Buton Dry Vermouth.

35. Under the arrangement with Lionel Braun (Great Vintners, Sydney Frank, and Stat Industries) the advertising was to be done and paid for by the importer and reimbursement from Buton was in the form of discount to the price of the Buton products.

36. In 1980, Gio Buton & C.S.p.A. entered into an importing agreement with Mediterranean Importing Co., Inc. located in New Hyde Park, New York.

37. The trademark BUTON or the trade name Gio. Buton C.S.p.A. appear on the labels and/or bottle caps of all Buton products sold in the United States.

38. Buton has a pending trademark application to register its mark in connection with brandy, wine and liqueurs in the United States Patent and Trademark Office. Buton's trademark application was filed April 11th, 1979 and received Serial No. 211,024. The date of first use claimed in the application is at least as early as 1963.

We have corrected and hereby adopt the Plaintiff's Findings of Fact and Conclusions of Law and as so amended they are appended to this Memorandum and Order hereto. Reference to specific parts of the Plaintiff's Findings of Fact and Conclusions of Law are made in the text here.

These two companies boast of origins in the early 1800s, plaintiff claiming to be a wholly owned subsidiary of an Italian corporation (IBP Industrie Buitoni Perugina S.p.A.) founded in 1827 by Giulia Buitoni which has been owned and managed by his direct descendants to this day and the defendant claiming also to be an Italian corporation founded in 1820 by Jean Bouton (a Frenchman who after the fall of Napoleon moved to Italy and changed his name to Giovani Buton). His ancestors were in the liquor business in Tonney Boutonne and their products apparently were well received in the major courts of Europe and by Napolean himself. Until recently the parties (and their related companies) have managed to live at peace with one another but in recent years, as their businesses have expanded, this former harmonious relationship seems to have deteriorated. This dispute started when defendant Gio. Buton & C.S.p.A. brought a petition to cancel plaintiff Buitoni Foods Corporation's United States trademark registration for its family name Buitoni for wine.

The parties appear to agree that unless the evidence at the non-jury trial is of a "character and amount [which] carries thorough conviction"[1] contrary to that presented to the TTAB, the administrative determination made by that Board must be sus-

tained. The proceeding before the TTAB involved no live witness testimony and exhibits were viewed only as part of the record or as appendices to affidavits and briefs. In this case, Buitoni U.S.A. presented live testimony from four new witnesses (Marco Buitoni, Peter Carp, Eddie Cirigliano and Roger Terry) and over two hundred (200) new exhibits. Expert testimony was presented before this Court whereas none was presented to the TTAB and in addition television commercials were shown for Buitoni foods and Buitoni wine and for Gio. Buton's ROSSO ANTICO.[2]

When analyzed in the light of the Second Circuit's recent decisions in *Vitarroz v. Borden, Inc.*, 644 F.2d 960 (2d Cir. 1981), and *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978), and when "all the Polaroid factors" are considered and "the conflicting interests of the parties involved" are balanced, 644 F.2d at 966–967, then it seems to us that the TTAB's decision is incorrect. We note that in the *Vitarroz* case the Court of Appeals for this Circuit expressly rejects the argument that "consideration of the *Polaroid* factors is proper only when the products do not compete" (644 F.2d at 965), holding that "[s]ince the *Polaroid* decision, we have consistently considered all the *Polaroid* factors, including the junior user's good faith, despite the similarity of marks and the close proximity of the products." *Id.* at 966. The Court of Appeals in the *Vitarroz* case also stated that the main issue was whether the senior user had demonstrated a "'likelihood' that, as a result of [the junior's] use of the name ... 'an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question.'" 644 F.2d at 963.

The *Polaroid* factors to be considered in determining how far a trademark "should be protected with respect to goods other than those to which its owner [Buton

1. *Morgan v. Daniels*, 153 U.S. 120, 124–125, 14 S.Ct. 772, 773–774, 38 L.Ed. 657 (1894). (The decision of the Patent Office is controlling "unless the contrary is established by testimony which in character and amount carries thorough conviction).

2. *See* Appendix, pp. 960–961, Findings of Fact and Conclusions of Law # 15–19.

in this case] has applied it" in a trademarks infringement and unfair competition case are:

"the strength of his [the prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers."

*Polaroid v. Polorad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

I

STRENGTH OF THE BUTON MARK

[2] The Second Circuit in *McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979), defined "strength" to mean:

The term "strength" as applied to trademark refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular although possibly anonymous source.

On this question this Court in *E. I. DuPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F.Supp. 502, 509 (E.D.N.Y. 1975), has said:

Strength or weakness is primarily a question of assessment of a mark's distinctiveness or popularity. Where the public has been educated to recognize and accept a particular mark as the hallmark for a particular source of that product, or the mark itself is inherently unique or has been the subject of wide advertisement, it is a strong trademark.

The evidence adduced at the trial showed that the strength of the BUTON mark in this country is very weak. Defendant exports brandy to the United States under the trademark VECCHIA ROMAGNA and aperitif under the trademark ROSSO AN-TICO. Defendant does not export table wine to this country, although it sells Spumonti, a sparkling wine, in Australia and Italy and the Australian Trade Commission has conducted promotional tastings in New York. Defendant has not used and does not use BUTON as a primary trademark in this country; its use of BUTON here is an incidental use. The primary mark on the labels on its aperitif bottles is ROCCO ANTICO and the fact that the aperitif is bottled by Gio Buton & C.S.p.A. is found only in small print in a label at the bottom of the bottle. Similarly, the primary mark on its brandy bottles is VECCHIA ROMAGNA and the fact that it is a BUTON brandy is not given comparable weight by the defendant. Again, while the defendant claims that it sold its products in this country at the Centennial Exhibition in Philadelphia, Pennsylvania, in 1876, it apparently did not commence reselling its products here until 1963. From 1963 to date its sales of brandys and aperitifs amounted to $490,000. Only $56,000 of these sales (all of VECCHIA·ROMAGNA) were made before Buitoni entered the market in 1974. Its advertising and promotion expenditures prior to 1978 totalled at most $50,000 and there was no advertising prior to 1975.[3] It has no offices, plants or employees in the United States.[4]

By way of contrast, plaintiff's mark was and is relatively strong and its use of its mark on its table wines was and is primary and highly visible. It is, of course, true that for the past 40 years plaintiff's mark BUITONI has been used primarily on its food products but such use has been on an ever increasing basis as its sales have expanded from about "two million dollars" in 1950 to "over 50 million dollars in 1980." (Tr. 37). Plaintiff's sales and advertising for the past 40 years have been so extensive (65 million dollars), particularly in the metropolitan areas of this country, that it is probable that the BUITONI mark is familiar to virtually all of the consumers in such areas. Moreover, notwithstanding the fact

---

3. In addition, the television commercial for Gio. Buton's highest selling product, ROSSO ANTICO, shown at trial, made no mention of the Buton name.

4. Appendix p. 967, Findings of Fact and Conclusions of Law # 86.

that its table wine sales and promotions have been limited in amount and to only a few years from and after 1974, it has consistently and prominently displayed its BUITONI marks on each of its wine bottles, together with the signature of its president, "Marco Buitoni."

In sum, Buitoni's mark is strong, Buton's is not, BUITONI has attained a "secondary meaning"; BUTON has not.

## II

### THE DEGREE OF SIMILARITY

The TTAB held that the two marks BUITONI and BUTON were "substantially similar in overall appearance and in significance (both being Italian surnames)". With this conclusion we are unable to agree.[5] Indeed we fail to understand how such conclusion was reached.[6] BUTON not only appears visually to be different than BUITONI but it sounds differently no matter how it is pronounced. The phonetic pronunciation of Buton is "Boo-tahn" and of Buitoni is "Bew-toe-nee".

If Walter S. Taylor's name had been Walter Tyler, for example, few, if any, would say that Tyler could not produce wines in New York State under his own name.[7] Other similar examples which leap to mind are names such as Smith, as compared to Smythe; Michael, as compared to Michelle; John, as compared to Jahnsen; Dickson, as compared to Dickinson; Helen, as compared to Elaine;—to name but a few.

Moreover, in the case at bar all plaintiff's wine bottles bear the signature of Marco Buitoni in large print across the face of the labels. None of the defendant's bottles do and, if they did, there is no resemblance between such full name and that of "Gio. Buton & C.S.p.A."

## III

### THE PROXIMITY OF THE PRODUCTS

While aperitifs unquestionably have a wine base, there is no other similarity between table wines or "vin ordinaire" and aperitifs. The former have an alcoholic content of less than 14% and the latter an alcoholic content of not less than 15%. Moreover, the former are for the most part consumed with dinner while the latter are before or after dinner drinks. According to defendant's own witness Mr. D'Agostino, the word aperitif means "just a moment, a time to drink, a time before lunch or dinner" or "a cocktail". Tr. 218–219. In addition, the evidence was quite clear that the likelihood that the defendant will produce in the United States a "vin ordinaire" or table wine in the foreseeable future is small.

## IV

### ACTUAL CONFUSION

There was little, if any, evidence of confusion between the two marks introduced at the trial. No witnesses were called to testify that they had in fact been confused in their purchases of the products of either the plaintiff or the defendant.

## V

### PLAINTIFF'S GOOD FAITH

There is no question but that plaintiff acted in the best of faith in placing its own mark on its own wine and the same, of course, is true with respect to the defendant. As indicated above, these two compa-

5. We disagree also with the TTAB's conclusion that Buton is necessarily an Italian surname as indicated by the parties joint findings of fact, *supra*, at 954, No. 25.

6. The facts in the *Vitarroz* case where the junior user prevailed are not unlike those in the case at bar in that the VITARROZ (senior) mark on its crackers was the primary mark and its BRAVO mark was a secondary mark and Borden's BRAVO's mark on its tortilla chips

was primary and its name was secondary. The extent of the differences between the marks and the products in the case at bar, when compared to the similarities between the same in that case, strongly suggest that the junior user here, Buitoni, is entitled to prevail at least as to its use of its mark on table wines.

7. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir. 1978).

nies have been operating under their respective family names since the early 1800's.

## VI

## THE QUALITY OF PLAINTIFF'S PRODUCT

While both parties profess to have little regard for the product of each other, there is little doubt in the Court's mind that both of them produce acceptable, if not superior, products.

## VII

## THE SOPHISTICATION OF THE PURCHASERS

The TTAB held that there was "in fact no evidence in the record to show that purchasers of these goods are discriminating, and in view of the nature of the goods, we find it hard to believe that the ordinary purchaser thereof (as opposed to the connoisseur) would be particularly discriminating." Again we disagree. American purchasers of aperitifs are almost by definition members or "would-be" members of the "International Set" and are not likely to purchase by mistake or accident table wines or "vin ordinaire" for their cocktail hour or "moment" or "time to drink . . . before lunch or dinner," as it were.[8]

The *Vitarroz* decision offers guidance to this Court in reviewing the TTAB decision in another way. The effect of the TTAB's decision that petitioner Buton "possesses a proprietary right in its mark sufficient to preclude the registration by a subsequent user of the same or similar mark for like or related goods," (Opinion at 15) is to allow Buton a "premonitory lien" on a "future market."

The *Vitarroz* decision criticizes such a result (644 F.2d at 968, n. 4):

"We do not, of course, decide that a *per se* rule entitling a senior user to injunctive relief on the basis of the identity of the marks and products would ever be appropriate. Prior to the decision in *Po-*

*laroid*, we demonstrated how such a rule, allowing a senior user a "premonitory lien" on a "future" or "adjacent" market could lead to "great injustice." *S. C. Johnson & Son, Inc. v. Johnson, supra,* 175 F.2d at 180. *See Dwinell-Wright Co. v. White House Milk Co., Inc., supra; Emerson Electric Manufacturing Co. v. Emerson Radio & Phonograph Co., supra.* These cases serve equally well as illustrations of how unfairly such a rule could operate even when the products compete in the same market. The increased proximity of the goods in such a case might enhance the likelihood of confusion, and hence the possibility of injury to the senior user, but injunctive relief still could inflict harm on the junior user out of all proportion to the harm that its refusal would cause the senior user."

We think such is the case here.

In the last analysis, this Court feels that it must be guided by the statements of the Court of Appeals in *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731 at 734, 735 (2d Cir. 1978), which appear to be particularly applicable here. (In this case, both the plaintiff and the defendant were surnamed Taylor).

> If . . . the second comer owns the company himself and evinces a genuine interest in establishing an enterprise in which his own skill or knowledge can be made known to the public, that argues in favor of allowing him to use his own name in some restricted fashion. *Cf. Stetson v. Stetson, supra,* note 2, and cases cited *infra* at 736. As this court said in *Societé Vinicole de Champagne de Mumm,* 143 F.2d 240, 241 (2d Cir. 1944), to prohibit an individual from using his true family surname is to "take away his identity: without it he cannot make known who he is to those who may wish to deal with him; and that is so grievous an injury that courts will avoid imposing it, if they possibly can."[4] (Footnote omitted).

In other words, so long as the plaintiff modifies its trademark registration so that its description of goods reads "table wine"

---

**8.** *See* Appendix p. 970, Findings of Fact and Conclusions of Law # 108.

and continues to endorse its table wine labels with the signature of its president "Marco Buitoni" in a prominent fashion as it is now doing, it should be permitted to do so. Moreover, in view of the dissimilarities outlined above, we do not think any disclaimer is needed or appropriate in this case.

Plaintiff claims it is entitled to market its wine under the trade name Buitoni because such marketing constitutes a natural expansion of its present business of Italian food products. We do not need to decide this issue because we have found the names Gio. Buton & C.S.p.A. and Marco Buitoni to be sufficiently dissimilar as to cause no conflict or confusion in their use.

It is evident from the foregoing that this Court does not believe that either party is entitled to an order enjoining the other from selling products that they are presently marketing in this country. Balancing the equities, plaintiff would appear to be entitled to continue to use its mark BUITONI together with its president's signature, Marco Buitoni, on table wines. Gio. Buton's pending trademark registration application for brandy, wine and liqueurs should be amended to read "brandy, aperitif wines and liqueurs." We need not now decide if defendant should be enjoined from using its mark BUTON or Gio. Buton & C.S.p.A. as a primary mark on table wines since no evidence was introduced of any present plans on its part to market a table wine in this country. Nor, on the same basis, need we decide at this juncture whether plaintiff should be enjoined from using its mark on any alcoholic beverages other than table wines. The TTAB's order should be modified in accordance with this decision and the plaintiff should submit a judgment in accordance with the foregoing.

SO ORDERED.

## APPENDIX

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## FINDINGS OF FACT

### A. PARTIES

1. Buitoni Foods Corporation

Buitoni Foods Corporation ("Buitoni USA"), a corporation of New Jersey (UF 17), is a wholly owned subsidiary of Industrie Buitoni Perugina ("Buitoni Italy"), a corporation of Italy. Buitoni USA is the owner of U.S. Trademark Registration No. 740,130 issued October 30, 1962 (PX 1,2; UF 3A); and No. 884,225, issued January 13, 1970 (PX 3,4; UF 3B) for many Italian-style food products; and U.S. Trademark Registration No. 1,040,711, issued June 1, 1976 (PX 5; UF 3C) for wine. The phonetic pronunciation of Buitoni is "Bew-toé-nee" (PX 19A–B).

2. There are many direct descendants of the founder of the Buitoni Italy company active in Buitoni businesses today. Marco Buitoni, Sr. (uncle of the Marco Buitoni, Jr. who testified in this action (PX 39A) is honorary chairman of Buitoni Italy (Tr. 69); Bruno Buitoni is president of Buitoni Italy (Tr. 69); Luigi Buitoni is president of Buitoni France (Tr. 69); Franco Buitoni is president of Buitoni United Kingdom (Tr. 69); and Guiseppi Buitoni is president of Buitoni Italy packaging company (Tr. 69).

3. The Buitoni family controls the majority of the stock of Buitoni Italy (Tr. 66–67).

4. Gio. Buton & C.S.p.A.

Gio. Buton & C.S.p.A. ("Gio. Buton") is a corporation of Italy with no offices in the United States (DX A–3, Question 7). Gio. Buton owns two United States Trademark Registrations for "ROSSO ANTICO" aperitif (see Appendix A to Plaintiff Buitoni Foods Corporation Post-Trial Brief) and has applied in 1979 for a registration for "Buton" (UF 25; DX BB). The phonetic pronunciation of Buton is "Boó-tahn."

### B. BUITONI ITALY AND BUITONI USA IN THE FOOD BUSINESS IN THE UNITED STATES

5. Buitoni USA's parent, Buitoni Italy, in 1976 had annual world-wide sales of over 220 million dollars (*JX I–R–16, p. 44*). During that same year, Buitoni USA had annual sales of over 32 million dollars (PX

13). In 1980 alone, over 100,000,000 BUITONI trademarked Italian-style food products were sold by Buitoni USA in the United States (Tr. 111–112).

6. Buitoni Italy was founded in 1827 (PX 31H, 32D, 39A) and from the 19th century to the organization in 1941 of Buitoni USA exported its BUITONI food products to the United States (Tr. 24–25, 70–72, 73–74; PX 30D, 30E, 30F, 30G, 30H, 30I, 30J). Buitoni Italy was awarded medals and certificates for exhibitions of its products at the Philadelphia 1878 (1876) Exhibition (Tr. 70; PX 30G), the Columbian Exhibition in 1893 in Chicago (Tr. 71; PX 30D),; the Universal Exposition in 1904 in St. Louis (Tr. 71–73; PX 30E, 30J); and the New York World's Fair in 1939 (Tr. 71–72; PX 30F).

7. Documentary and testimonial evidence was introduced at the trial indicating shipment into, and consumption of, BUITONI products in the United States in at least the 1920's (Tr. 24–25, 73–74; PX 30H, 30I).

8. Giovanni Buitoni, great grandson of the founder of Buitoni Italy (PX 31E, 31G) and uncle of Marco Buitoni, Jr. (PX 39A), visited the United States in 1939 and decided to found a United States-based Buitoni business (PX 31E, 39D). Buitoni USA commenced business in the early 1940's (UF 17). Plants were built in Brooklyn and in Jersey City and offices were in New York City; later, in 1951, a larger facility was built consolidating the plants and offices in South Hackensack, New Jersey (Tr. 108–109; PX 31A, 31H).

9. Buitoni USA's sales of BUITONI trademarked products in 1950 were about $2,000,000 and have increased until they were over $44,000,000 in 1980 (Tr. 37, 203–204; PX 13).

10. BUITONI restaurants existed in New York from at least as early as the early 1950's through the late 1960's (Tr. 16–18, 27; PX 32A, 32B, 32C, 32D, 32E, 39G) and those restaurants served wine as a natural accompaniment to their Italian-style meals (Tr. 26; PX 32D, 39G). Buitoni USA also had a franchised restaurant in Indianapolis, Indiana (Tr. 19).

11. Giovanni Buitoni, the president of Buitoni USA (Tr. 20, 21; PX 31G) and a full-time resident of the United States for over 25 years (Tr..21; PX 39D) worked vigorously to promote the Buitoni company name and trademark by means of civic affairs (Tr. 19–21). Buitoni USA sponsored The Dutchess of Windsor Ball at the Waldorf-Astoria Hotel where in attendance along with Giovanni Buitoni were, among others, the Dutchess of Windsor and Clare Booth Luce, the United States ambassador to Italy (Tr. 19; PX 31B). Giovanni Buitoni made his operatic debut at Carnegie Hall singing with Licia Albanese (Tr. 20–21; PX 31E, 39C, 39D, 39E); was invited to appear, and appeared, on the Johnny Carson "Tonight" Show (Tr. 20; PX 31E; 31F) and was photographed with President John F. Kennedy (Tr. 124; PX 39B).

12. Joe DiMaggio was Vice President in charge of Public Relations on the West Coast for Buitoni USA, hosting a weekly Buitoni sponsored television show with guest star appearances by Jackie Robinson and Phil Rizzuto and had his name used on a BUITONI dinner package (Tr. 23; PX 31C, 31D). Joe Garagiola and Frank Fields, the weather reporter, were other prominent American personalities engaged to promote BUITONI products (Tr. 23).

13. In addition to its large production and administrative facilities in South Hackensack, New Jersey, Buitoni USA has sales offices, regional managers or full-time food service employees in Florida, Texas, California, New Jersey, Rhode Island, Colorado, Minnesota and other states (Tr. 110–111). Today there are approximately 500 employees of Buitoni USA in the United States (Tr. 110).

14. Sales of Buitoni-trademarked products are nationwide (Tr. 36–37, 42–43, 205–206). In each of seven states, the total sales of BUITONI-trademarked products in 1980 was over $1,000,000 and in each of 16 other states the total sales of BUITONI-trademarked products in 1980 was over $100,000 (Tr. 36; PX 14).

15. Buitoni USA's gross sales of BUITONI-trademarked products over the past 30

years exceeded one-half billion dollars (Tr. 37, 203–204; PX 13). The sale of over one-half billion dollars of BUITONI-trademarked products translates into over 2,000,-000,000 BUITONI-trademarked product packages having entered the consumer market each bearing the mark BUITONI (Tr. 38), at least once and most bearing the mark several times (see PX 6, 7, 8, 9, 10, 11 and 12).

16. In 1980 the sales of BUITONI-trademarked spaghetti and macaroni products were 30% of the sales of all BUITONI-trademarked food products (Tr. 37–38; PX 13). For the past eleven years the sales of BUITONI-trademarked food products, other than spaghetti and macaroni foods, has totalled two hundred fifty million dollars (PX 13).

17. On every Buitoni USA food product sold under the trademark BUITONI, BUITONI alone (with no prefix and no suffix) is the prominent designation of source and origin of the product (PX 6, 7, 8, 9, 10, 11 and 12).

18. Buitoni USA's food product logo is:

(PX 9I)

19. Marco Buitoni, Jr., whose name and signature appears on BUITONI products, including food and table wine (*Tr. 87; JX I—R–19, R–20, R–21, R–24, R–25, R–26*; PX 6A, 6D, 6E, 6F; 6G, 6H, 6J, 6L, 6P, 6Y; PX 6A–H, 9A–9K, 10A, 10D, 12B, 12D, 12E, 12G, 12I, 12J, 23A–F, 23H–K, 25C, 28C), is the Chief Operating Officer of Buitoni, Italy (Tr. 66) and is the Chairman of the Board of Directors of Buitoni U.S.A. He is the great-great-grandson of Guilia Buitoni, the founder of Buitoni Italy (PX 31E, 31G, 39A). Marco Buitoni lived in the United States and was with Buitoni USA for a long time, first as a salesman in 1958 and 1959, and then as president and chief executive officer from 1966 to 1976 (Tr. 67–68).

20. Buitoni USA's advertising and sales promotion expenses in 1950 were about $2,000,000 (PX 17) and increased to over $8,000,000 in 1980 (Tr. 38; PX 17), with a total of about 65 million dollars spent during the years 1950–1980 (Tr. 38; PX 17). For the past eleven years, the total expenditures exceeded two million dollars annually (Tr. 38–39; PX 17).

21. The advertising and sales promotion expenses for BUITONI-trademarked fine quality Italian food products have been directed to the American consuming public throughout the United States using television, radio, newspapers, magazines, display cards in stores, and BUITONI's own trademarked product packages (Tr. 29–30, 41; PX 31H).

22. Buitoni USA advertises its BUITONI-trademarked products in large metropolitan newspapers, magazines (Tr. 41,204–205; PX 18), on radio (Tr. 41), and on television in commercials broadcast in Chicago, Boston, New York, Philadelphia, Baltimore and Washington (Tr. 41,103–105, 131–132, 348–350; PX 19A–19H). Six exemplary television commercials were shown at the trial (Tr. 103–105, 348–350; PX 19A, 19B).

23. Buitoni USA's advertising and sales promotion has also taken the form of (i) discounts on the purchase price for BUITONI-trademarked products to food chains and food stores in exchange for the food chains or food stores running their own advertising in newspapers (Tr. 42,206; PX 21), and such advertisements for BUITONI-trademarked products have appeared in 30 to 40 states throughout the United States

(Tr. 206); (ii) product brochures used in promoting BUITONI-trademarked products (Tr. 43; PX 22); and (iii) product promotions for BUITONI-trademarked products appearing on the products themselves in the form of discounts or discount coupons for purchases of BUITONI-trademarked products (Tr. 35–36; PX 12A, 11A). BUITONI products have also been reviewed and received publicity in major metropolitan newspapers (Tr. 129–130; PX 31I–31K).

24. BUITONI USA today markets over 250 different Italian-style food products excluding table wines (Tr. 30). The product line includes an extensive line of BUITONI-trademarked Italian frozen food products (Tr. 30–31, 45; PX 6, 9); sales to institutions (Tr. 30; PX 22F); many BUITONI-trademarked pasta items (Tr. 30; PX 12); a complete line of canned products (Tr. 30, 34–35; PX 7, 10); miscellaneous food products (Tr. 34–35; PX 8A); over a dozen items in the sauce line (Tr. 35; PX 10, 11); and cheeses (Tr. 46; PX 11D).

25. All of Buitoni USA's products are quality products which, with the exception of canned products and sauces, sell at a premium (Tr. 29–30, 141–142); those other products sell at prices comparable to those of competitors (Tr. 142).

26. In addition to the Italian-style food products listed in the registrations for BUITONI (See PX 1, 3; UF 3A, 3B), BUITONI has also been used on other Italian-style food products which are not listed in the registrations, including frozen dishes of seafood and fish (PX 6A, 6E–G); lasagna and other types of pasta (PX 6C, 6H–M, 6S–Y); chicken (PX 6D, 6R); veal (PX 60); eggplant (PX 6N); and sausage and peppers (PX 6B, 6P); canned goods (PX 7A, 7B) and bread crumbs (PX 8A).

27. With specific reference to Italian-style foods, companies bearing Italian family names are in the food and table wine business in the United States—Bertolli trademarked spaghetti sauce, olive oil and table wine (Tr. 115; PX 34D) and Pastene trademarked canned tomatoes, tomato paste, tomato puree and chablis, burgundy and chianti table wines (Tr. 116; PX 34F).

28. Bertolli trademarked food products and wine appear side-by-side in 1980 advertisements directed to the American consuming public in the nationally circulated magazines *Bon Appetit* and *Family Circle* (Tr. 115; PX 34G, 34H). Pastene uses billboard advertising in downtown Boston (Quincy Market) and in Cambridge, Massachusetts (Lechmere Station) with the phrase "We'll wine and dine you PASTENE", and picturing Pastene trademarked canned tomatoes next to its table wine (Tr. 116; PX 34I). Both Bertolli and Pastene have United States trademark registrations for food and for wine (PX 34R, 34S). Bertolli's and Pastene's United States trademark registrations for foods cover a more extensive line of Italian-style foods than the sample products spaghetti sauce, olive oil, canned tomatoes, tomato puree and tomato paste (PX 34R, 34S).

29. Other trademarks and brand names are used for both food products and services and table wine (e.g., Paul Bocuse beaujolais table wine and restaurants (Tr. 113, 336; PX 34C); Shop-Rite food and burgundy table wine (Tr. 113, PX 34E); Manischewitz food and concord grape table wine (Tr. 113; PX 34B); and Safeway's "Scotch Buy" brand food and rosé table wine (Tr. 113, PX 34A).

30. PAUL BOCUSE, SHOP–RITE, MAXIM's and MACY'S are all trademarks which have been registered in the United States Patent and Trademark Office for food or food services and for wine (Tr. 65; PX 34J, 34K, 34O, 34Q).

31. In some 27 states, table wine may be bought in food stores (Tr. 198–199); and in such populous states as Virginia, Washington, D. C., Florida, Texas and California wine, and food are jointly advertised in newspapers by food stores (Tr. 112, PX 33).

32. Wineries publish booklets and cookbooks containing recipes for cooking with wine and show food and wine together in advertising and promoting their wines (Tr. 157–158).

33. Other food companies that have acquired or are also in the wine business (not necessarily with a common trademark) include R. T. French/Widmer Wine Cellars

(Tr. 154–155, 157), Coca Cola/Taylor Wine (Tr. 156, 157, 170), Coca Cola/Sterling Wine (Tr. 170, Nestle/Beringer (Tr. 157), Beatrice Foods/Kenwood (Tr. 170), Heublein/Inglenook and Bristol Cream (Tr. 170), Nabisco/Julius Wile (Tr. 170), Pepsi-Cola/Monsieur-Henri (Tr. 170–171). Pepsi-Cola also owns Pizza Hut which serves alcoholic beverages and food at some of its restaurants (Tr. 170–171) and Pillsbury owned Souverain until recently (Tr. 170).

34. Buitoni USA has advertised its own wines on its frozen food packages using a wine glass pictured on the front with the words "Look For Imported BUITONI Wines, Italy's Finest" (Tr. 31–32, 45; PX 6C, 6J, 6K, 6M, 6N, 9A, 9B); a wine display on the back showing various BUITONI-trademarked wines (Tr. 31, 45; PX 6A, 6J, 9B; *JX I—R19–R26*); and a wine display on the back providing serving suggestions for wines with particular foods (PX 6A; *JXI—R19, R21*).

35. Buitoni USA's current product brochures show BUITONI-trademarked food products served with wine as a natural accompaniment (Tr. 43, PX 22A, 22E, 22F, 22H).

36. Buitoni USA's current television food commercials also show BUITONI-trademarked food products served with wine as a natural accompaniment to the food (Tr. 104–105; PX 19A, 19B, 19C, 19G).

37. Buitoni USA has consistently emphasized wine in its marketing of its Italian-style food products with its canned food labels and the front of many of its frozen food packages depicting a table setting complete with the BUITONI Italian-style food product together with either its own or another's wine, by the glass or in a bottle, or both (Tr. 32–34; PX 6A–6T, 6V, 6X, 6Y, 9B, 9H, 9J).

## C. DEFINITIONS OF TABLE WINE, BRANDY, APERITIF AND LIQUEUR

### 1. BUITONI USA's PRODUCT—TABLE WINE

38. The United States Department of the Treasury (Bureau of Alcohol, Tobacco and Firearms) defines *table wine* as:

... grape wine having an alcoholic content not in excess of 14 percent by volume. Such wine may *also* be designated as "light wine", "red table wine", "light white wine", "sweet table wine", etc., as the case may be. 27 C.F.R. § 4.21(a)(2) (emphasis supplied)

39. In the United States, table wine is marketed to be drunk with dinner (Tr. 192).

40. Examples of table wine marketed in the United States include Bolla trebbiano wine (Tr. 171–174), Bertolli verdicchio wine (PX 34D(1)), Pastene burgundy, chianti and chablis wines (PX 34F (4–6)), Buitoni trebbiano and sangeovese wines (PX 23H, 23I, 23J, 23K), Buitoni chablis, the various Buitoni verdicchio, barolo, barbera, grignolino, chianti, bardolino, valpolicella, amorne, rosso conero, rosé d'alba, soave, dolcetto, nebbiolo wines imported by Renfield (PX 23 (A–I), 25B; Tr. 63, 82–83a, 127–128; *JXI—R–A to R–O*, Manischewitz concord grape wine (PX 34B(1)), Shop-Rite burgundy wine (PX 34E(1)), Scotch Buy rosé wine (PX 34A(1); Tr. 197) and Paul Bocuse beaujolais wine (PX 34C(1)).

41. Italian wines today represent about 65% of the imported wine sold in the United States and are consumed by the public with all kinds of foods (Tr. 183–184).

42. Gio. Buton is not in the table wine business anywhere in the world (Tr. 283). Gio. Buton offered no proof that it will ever enter the table wine business. Gio. Buton's only planned new product for the United States (Tr. 250–251, 274) is a liqueur, Cremaretto, made of cream and amaretto (Tr. 250–251).

### 2. GIO. BUTON'S PRODUCTS—BRANDIES, APERITIFS AND LIQUEURS

#### A. *Brandy—Gio. Buton's Historic Product*

43. Under United States legal standards, brandy is:

... an alcoholic distillate from the fermented juice, mash or wine of fruit, or from the residue thereof, produced at less

than 190° proof in such manner that the distillate possesses the taste, aroma and characteristics generally attributed to the product, and *bottled at not less than 80° proof* ... 27 C.F.R. § 5.22(d) (emphasis supplied)

44. Examples of brandy manufactured by European manufacturers include defendant's VECCHIA ROMAGNA (DX–B) and Stock's, Hennessey's, Courvoisier's, and Martell's brandies (Tr. 270–272).

45. Different marketing approaches and different marketing strategies are used in the United States for the marketing of spirits as distinguished from the marketing of wines (Gio. Buton distributor di Belardino, Tr. 295).

46. Gio. Buton is a European manufacturer of brandy (Tr. 215). There are no European manufacturers of brandy who *also make table wine* or who also export to the United States table wine (Tr. 185).

47. In the United States there are manufacturers, all in California, of both table wine and brandy, which include Christian Brothers (Tr. 184), Almaden (Tr. 192–194), Paul Masson (Tr. 194), Korbel (Tr. 194) and Gallo (Tr. 194). This is because they are in the north coast and central valley of California and have access to the Thompson seedless variety of grapes, the lowest cost grape commodity available which can be used as a table grape or for raisins or for brandy (Tr. 184).

B. *Aperitif Wines—Gio. Buton's Recent Products*

48. Under United States legal standards, aperitif wine is:

... wine having an alcoholic content of not less than 15 percent by volume, compounded from grape wine containing *added brandy or alcohol, flavored with herbs and other natural aromatic* flavoring materials, with or without the addition of caramel for coloring purposes, and possessing the taste, aroma, and characteristics generally attributed to aperitif wine and shall be so designated unless designated as "vermouth" under paragraph (b) of this section. 27 C.F.R. § 4.21(g)(1) ... (emphasis supplied)

The term aperitif as used refers to a *drink* before or after dinner (Tr. 159); examples of aperitif as defined include Gio. Buton's ROSSO ANTICO which is 54° or 27% alcohol (Tr. 220; DX–C).

C. *Aperitif Wines—Vermouth*

49. Under United States legal standards, vermouth is:

... a type of aperitif wine compounded from grape wine, having the taste, aroma, and characteristics generally attributed to vermouth, and shall be so designated. 27 C.F.R. § 4.21(g)(2)

Vermouth, unlike aperitif wine, is a "formula wine" for which the manufacturer is required to submit to the U.S. Government the formula prior to fabrication and a number is then issued to the formula (Tr. 159–160); examples of vermouth, as defined, include Cinzano vermouth (Tr. 159).

D. *Liqueurs—Gio. Buton's Recent Products*

50. In 1977 and 1978 Gio. Buton imported liqueurs, Walnetta and Amaretto (DX Q1), and its new product, which has not been imported to the United States, is another liqueur, Cremaretto (Tr. 249–250, 274). Under United States standards, liqueurs are:

... products obtained by mixing or redistilling distilled spirits with or over fruits, flowers, plants, or pure juices therefrom, or other natural flavoring materials, or with extracts derived from infusions, percolation, or maceration of such materials, and containing sugar, dextrose, or levulose, or a combination thereof, in an amount not less than 2½ percent by weight of the finished product ... 27 C.F.R. § 5.22(h).

51. Gio. Buton also produces medicinal bitters (Tr. 226; DX K, K–1), but no evidence was offered of current imports into the United States. Medicinal bitters are on a spirits base, not on a wine base (Tr. 160–161).

52. Buitoni USA has no plans to go into the brandy or aperitif business (Tr. 123).

## D. THE BUITONI FAMILY, BUITONI ITALY AND BUITONI USA IN THE TABLE WINE BUSINESS

53. Buitoni Italy was an exporter of table wines in at least 1910, though such wine may not have carried the Buitoni name (Tr. 70–72; PX 30G).

54. The Buitoni family as a group were entrepreneurs active in the table wine business from about 1919 to 1944. They purchased 60% of the ownership of a chateau in Tuscany producing Chianti Melini, a well-known chateau name (Tr. 78–79; PX 30K, 30L). Although the Buitoni name never appeared on Chianti Melini in the United States (Tr. 98–99), photographs of Chianti Melini appear on current Buitoni USA food packages (PX 9B, 9H).

55. Buitoni Italy again entered in to the table wine business in 1972 with respect to L'Aiola Chianti Classico wine in Italy, with an agreement to last from 1973 to 1982 (Tr. 79–80; PX 30A, 39F).

56. Paolo Buitoni, a member of the Buitoni family and managing director of Buitoni Italy until 1976 (*JX I—R–16, p. 28*) currently sells 1500 quintals (about 330,000 pounds) of grapes from his own vineyard on a yearly basis to Cantine Giorgio Lungarotti (hereafter "Lungarotti Winery") that provides the wines presently sold in the United States under the name BUITONI (Tr. 87–90). Paolo Buitoni's vineyard is located close to both the headquarters of Buitoni Italy in Perugia and to the Lungarotti winery (Tr. 90, 175).

57. Marco Buitoni, Jr. (then chief executive officer of Buitoni USA and now chief operating officer of Buitoni Italy, (Tr. 66, 68) had the idea to use the family name BUITONI on table wine in the United States; that idea first came to him in 1972 or 1973 (Tr. 80). He, with others, first met with the Schenley Company in May of 1973; however, no agreement was reached with Schenley (Tr. 80–82).

58. Buitoni USA then received a visit from a representative of Renfield Corporation who had "found out that Buitoni was the best representative of Italian products"

(Marco Buitoni, Tr. 82; see also Braun deposition, p. 40 ["it did have a higher quality image with the consumers and it was a little bit higher priced than the others"] UF5). Renfield Corporation approached Buitoni USA to use the trademark BUITONI for wines because Buitoni "had the best reputation for Italian foods—most expensive—and best quality" (JX I, Geller Dep., p. 35).

59. Marco Buitoni knew at that time that Gio. Buton was not in the table wine business in Italy or in the United States (Tr. 91), although he knew that they were well known in Italy in the brandy and aperitif business (Tr. 90).

60. Buitoni USA licensed exclusive use of the mark BUITONI for wines to Renfield by an agreement dated November 9. 1973 (UF 6); quality control was in Buitoni USA's hands (Tr. 82).

61. Renfield filed for five label approvals with the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms for BUITONI wines between August 1 and August 7, 1974 (PX 24A).

62. The shipments of the BUITONI wine were ordered by Renfield at least as early as November 11, 1974 (*JX I—R3–1, R3–4, R4–1*) and a first shipment left Italy on November 24, 1974 (*JX I—R3–2, R3–3, R3–5, R3–6*) and cases of BUITONI wine were withdrawn from customs port of entry, New York, in December, 1974 (*JX I—R–3–8 through R–3–17*).

63. Buitoni USA applied to register the trademark BUITONI for wines in the United States Patent and Trademark Office (UF 8).

64. United States trademark registration for BUITONI for wines, Registration No. 1,040,711, issued June 1, 1976 (PX 5; UF 10); that registration is still in full force and effect. Although its cancellation has been ordered, that order is not effective as a result of this action.

65. Buitoni USA's licensee Renfield sold 74,060 gallons of wine (which would be over 29,000 cases of 24 fl. oz. bottles or approximately 350,000 24 fl. oz. bottles of wine) for

the twenty-four months from April 1975 through March 1977 (*JX I, Geller Dep. p.9*). All of this wine was marked with the primary trademark BUITONI without prefix or suffix (PX 23A—23F, 25B, JXI—*R–A to R–O*).

66. These BUITONI wines were sold through 69 Renfield distributors located in 26 states (*JX I, Geller Dep. p. 4, 5, R 12–1 to R 12–7*).

67. The wholesale (i.e., United States distributor to retailer, not foreign exporter to distributor) dollar amount sales volume totalled $651,741 (UF 9). The retail price of the 24 fluid ounce bottles was $1.49 to $8.99 (PX 37D).

68. The mark BUITONI was advertised by way of point-of-sale displays in liquor stores (PX 20; *JX 1, Dep. Schwartz, pp. 6–7, Aff. Schwartz*), table "tents" for restaurants, and advertising brochures directed to the trade (*JX I, Dep. Schwartz, pp. 6–8, Aff. Schwartz*) and radio commercials (*JX I—R 14–1, R 14–7*) emphasizing the mark BUITONI.

69. $32,636 was spent on advertising by Buitoni's licensee Renfield (*JX I, Dep. Geller p. 10*).

70. Buitoni USA itself incurred promotional expenses for the BUITONI wine (*JX I—Gass Aff.*); however, the exact amounts cannot be separated from the amounts spent by Buitoni USA in advertising and promoting its Italian-style food products, i.e., it had picture displays on its frozen food and pasta products showing the existence of BUITONI wines (*JX I—R–19 to R–26*; PX 6A, 6C, 6J) and displaying on the front of the frozen food packages bottles of its BUITONI wine (PX 6A, 6B, 6E, 6F, 6G, 6O, 6P, 6R).

71. A dispute between Buitoni USA and Renfield ensued and the license agreement was terminated (*JX I, Gass Aff.; Geller dep., pp. 31; R–18*).

72. In 1977, Foreign Brands, Inc., a wine importing company in New York, was purchased by Manus Gass, (Tr. 118–119) then executive vice president, and now president, of Buitoni USA (Tr. 108).

73. Discussions regarding the distribution by Foreign Brands of BUITONI wine took place during the years 1977 to 1980 between Foreign Brands and Buitoni USA (Tr. 119–121, 128). A draft agreement was prepared in June 1978 (Tr. 119; PX 27A); wine labels for that BUITONI wine were developed jointly by Marco Buitoni, Jr. himself in Italy; Buitoni USA and a professional label designer (Tr. 86, 120; PX 26A—26D).

74. Implementation of this agreement was not possible due to the fact that another equity owner of Foreign Brands embezzled funds from the company. As a result, Foreign Brands went into Chapter XI Federal Bankruptcy proceedings; these proceedings were discharged in December 1980 (Tr. 120–121).

75. In December 1980, some distribution of BUITONI wine, personally tasted and approved by Peter Carp and distributed by Foreign Brands took place (PX 24B, 25C, 27B; Tr. 176–178). The Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms label approvals for this BUITONI wine was applied for in October and December 1980 (PX 24B). Peter Carp, who has worked in the wine business for over twenty-five years (Tr. 161) and is President of the Association of American Vintners (Tr. 155) joined Foreign Brands as vice president and general manager in 1980 (Tr. 154, 155).

76. Foreign Brands, Inc. was purchased by Buitoni USA for $452,000 in 1981 (Tr. 122, 132) and changed its name to Carlyle Importers, Inc. in March 1981 (UF 18).

77. In the latter part of 1979 or early part of 1980, arrangements were made with Lungarotti Winery for the production of the new BUITONI wine. The Lungarotti Winery is five miles from Perugia (Tr. 87) where Buitoni Italy is located (Tr. 87,175).

78. Labels were prepared for wines to be bottled by Lungarotti Winery and distributed by Foreign Brands under the mark BUITONI (PX 28B, 28C). The label logo as used on the BUITONI wines (PX 23H–23K, 28C) (shown below) is identical (save for color) to the BUITONI food labels (see Proposed Finding 18, *supra*):

(PX 28C)

79. Both Marco Buitoni, Jr. and Peter Carp visited the Lungarotti Winery and tasted and approved the production run of all trebbiano wine currently imported under the BUITONI mark (Tr. 174–176). That batch contained 6,000 cases of wine (Tr. 178). Trebbiano is a white wine made from the trebbiano grape from a certain area in Italy (Tr. 172). In a similar system of distribution, Bolla purchases trebbiano wine from Cantina Cavaliere in Aprilia (Tr. 173–174) which it sells under the BOLLA name in the United States (Tr. 172).

80. Buitoni USA is presently selling its BUITONI trebbiano and sangiovese wines (PX 23H–23K) in New England (Tr. 86, 179) and in just two months in New England alone there have been sales of $150,000—$200,000 at retail (Tr. 181–182).

81. A report upon a recent qualitative market study, called a "focus group" used to delineate the specifics of a television commercial (Tr. 196) indicated that BUITONI was a highly regarded Italian product name as compared with, for example, Alfa Romeo, Stella D'Oro and Perugina (Tr. 195–196). The television commercial produced after that report, and shown at trial, showed a picnic with wine, cheese and bread (PX 28H, Tr. 106,351) and used a minimum of words, though it used the BUITONI name twice (Tr. 197,351).

82. The New England advertising schedule for BUITONI wine called for an average of 95% of all households in that area to see its wine commercials about eight times (Tr. 180). The television advertising, costing $83,500 for a five-week period (May 18–June 21) appeared on such well-known pro-grams as Good Morning America, Charles Kuralt, WKRP, CBS Movie, M.A.S.H., Merv Griffin, Lou Grant and Barney Miller (Tr. 180–181; PX 28F, 28G). This advertising will continue in the fall, as television viewing decreases in the summer months (Tr. 198).

83. The "roll-out markets" (i.e. "rolling out" from the Boston and Rhode Island area) for the BUITONI wine are Spring-field, Massachusetts and Connecticut, for which advertising commitments have already been made (Tr. 198).

## E. GIO. BUTON IN THE BRANDY, APERITIF AND LIQUEUR BUSINESS

84. Gio. Buton & C. S.p.A. is an Italian corporation founded in 1820 by Jean Bouton, a French citizen, who changed the spelling of his surname to "Buton" from the French name "Bouton" (UF 19, DX–M) and named his company "Distilleria Giovanni Buton" (DX–M).

85. No one named "Buton" has been active in Gio. Buton's business since the 19th Century (UF 20; DX A–1, Cross-Question 3).

86. Gio. Buton has no offices, plants or employees in the United States (DX A–3, Question 7). Michele d'Agostino of Gio. Buton export department for North America (Tr. 214–215) is the person most involved with exports to the United States since 1975 and spends about three months a year on such matters in his office in Italy (Tr. 284–285), and travels to New York once or twice a year without usually traveling to the Midwest or West (Tr. 275–276).

87. Defendant Gio. Buton's expert advertising witness, Ira Ginsberg, stated that he had never heard of Gio. Buton or its products prior to being engaged as Gio. Buton's expert witness in this litigation (Tr. 327–328). Buitoni USA's expert witness, Peter Carp, has been in the wine business for over 25 years (Tr. 161), twenty years of which have been in the United States (Tr. 154), and is familiar with the brandy business due to his employment by Austin-Nichols (Tr. 154, 186), had also never heard of Gio. Buton or its products prior to his involvement in this litigation (Tr. 161–162). Eddie Cirigliano, who was born in 1916, grew up in a section called "Little Italy" in New York City and always lived in Italian ethnic neighborhoods (Tr. 25) testified that he had not heard of Gio. Buton or its products prior to his involvement in this litigation (Tr. 25).

88. The documentary evidence attempting to show that Gio. Buton was present in the United States before 1961 consists of a photograph of a medal and a photograph of a certificate from the United States Centennial Commission—1876 Philadelphia (Tr. 224, 225; DX I, J); a 1906 letter from the Central Italian Medicine Warehouse, New York City (Joseph Personeni) regarding a United States design patent on a bottle of Gio. Buton's medicinal bitters (Felsina bitters) (Tr. 211, 226, 230, 231; DX K, K–1, L, O, O–1). In R. Kipling, *From Sea to Sea* (London 1900) at page 492 there is reference to a "Button Punch" as follows (Tr. 228–231, 232; DX–N): "No man but one knows what is in it. I have a theory it is compounded of the shavings of cherubs' wings, the glory of a tropical dawn, the red clouds of sunset, and fragments of lost epics by dead masters." There is no evidence that this reference relates to Gio. Buton or its products. In addition, defendant's President and Export Manager alleged, in written answers to written questions, shipment of Gio. Buton products to the United States prior to 1961, however, without supplying any documentation of such alleged shipments (DX A–1, Direct Questions 11, 12, 13, 14, 16, Cross-Question 7; DX A–3, Question 12, 19(a), 20, 20(C). Some random copies of allegedly earlier labels were produced; there were no supporting documents (JX I, P–E to P–K, P–M; DX A–3, Question 20).

89. In 1961 Buton signed an agreement with Federal Liquors Ltd. of Boston regarding the distribution in the United States of Gio. Buton's VECCHIA ROMAGNA brandy and Gio. Buton's vermouth (aperitif) (DX D, E). The invoices indicate an average of less than two shipments per year into the United States, for a combined total of less than $30,000 (or a total of less than 4000 cases) for both the brandy and the vermouth for the seven-year period 1963 through 1969 (*JX I—P–1, P–2, P–3, P–15, P–19, P–20, P–21, P–22, P–23, P–24, P–25, P–26, P–28, P–29.*

90. Sometime in 1970 Gio. Buton began importing its VECCHIA ROMAGNA brandy to Paterno Imports, an importer in Illinois, who was their exclusive importer for brandy from 1970 through 1977 (Tr. 222, 224; DX A–2, pp. 12, 21; DX A–3 Question 19(a)). In the period from 1970 to 1974 the only Gio. Buton product exported to the United States was its VECCHIA ROMAGNA brandy (DX A–2, pp. 11, 12, 20) and the sales for the four-year period 1971 through 1974 were as follows (DX–Q):

| 1971 | $ 7,292 |
| 1972 | $ 5,510 |
| 1973 | $18,144 |
| 1974 | $24,714 |

91. In late 1974 BUITONI wine was first shipped into the United States (*JX I—R–3–1 through 3–6, 3–8 through 3–17*; see also Proposed Finding 62, supra).

92. Starting in 1976, Gio. Buton began to export ROSSO ANTICO aperitif to the United States (DX–F). The label on the ROSSO ANTICO bottle does not show the name "Buton" but rather shows the company name "Gio. Buton & C. S.p.A." in type size as follows:

PRODUCE OF ITALY·BOTTLED BY GIO.BUTON & C. S.p.A DIST. OF TRIESTE·IMPORTED BY GREAT VINTNERS INT. LTD. NEW YORK, N.Y. ALCOHOL 17% BY VOL 750 ml (25.4 FL.OZ.)

Although the word "Buton" appears on the cap, that is a place for a price tag which would cover the name (Tr. 189).

93. From 1975 to the commencement of this action, Gio. Buton has exported VECCHIA ROMAGNA brandy and ROSSO ANTICO aperitif to the United States in the following amounts:

| | | VECCHIA ROMAGNA | ROSSO ANTICO |
|---|---|---|---|
| (DX Q and Q–1) | 1975 | $31,761 | NONE |
| (DX Q and Q–1) | 1976 | $44,909 | $171,926 |
| (DX Q and Q–1) | 1977 | $39,527 | $39,527 |
| (DX Q and Q–1) | 1978 | $42,140 | $153,267 |
| (DXA–3) | 1979 | NONE | NONE |

94. In 1980, the sales of VECCHIA ROMAGNA brandy and ROSSO ANTICO aperitif to the United States did not begin until at least April 1980 (DX G, H; Tr. 292–293). The United States importer had a gross sales to its distributors for the period April 1980 to October 31, 1980 of 206 cases of ROSSO ANTICO aperitif and 81 cases of VECCHIA ROMAGNA brandy and for the period of November 1, 1980 to June 30, 1981 of 2,549 cases of ROSSO ANTICO aperitif and 1,138 cases of VECCHIA ROMAGNA brandy (Tr. 300–301). The United States importer also has a current inventory (as of July 20, 1981, the date of trial) of about 800 to 1,000 cases (Tr. 302–303). Since Gio. Buton's sales prices to its distributor for a case of ROSSO ANTICO is $18.00 and for a case of VECCHIA ROMAGNA is $21.00 (Tr. 286–287), Gio. Buton's sales for these periods were approximately as follows:

| | VECCHIA ROMAGNA | ROSSO ANTICO |
|---|---|---|
| April 1980 to October 31, 1980 | $ 1,701 | $ 3,708 |
| November 1, 1980 to June 30, 1981 | $23,898 | $45,882 |

with approximately $14,400 to $21,000 worth of Gio. Buton's products in the inventory of its United States importer (Tr. 286–287, 302–303). All of the case figures were read at trial from computer sheets of Gio. Buton's distributor (Tr. 300–303).

95. D'Agostino testified at trial that prior to November 1980 Gio. Buton had no print media advertising in the United States directed to the consumers (Tr. 261). Advertisements in *Il Progresso*, an Italian-language newspaper published in the United States, are all dated February 1981 (DX QQ1–QQ4), although D'Agostino testified that there were advertisements in *Il Progresso* as early as November 1980 (Tr. 261). Gio. Buton advertisements appeared in two issues of the United States edition of *Italian Wines & Spirits* (Tr. 233–234, 237; DX R–1, R–3), a magazine directed to the trade (Tr. 236).

96. A television commercial for ROSSO ANTICO was made in 1978; however, it did not mention or show the BUTON mark at all (Tr. 350–351; PX 41). The text of the commercial states: "ROSSO ANTICO before and after everything" (Tr. 350–351), which implies it was not, in contrast to table wine, to be drunk while eating a meal. There was oral testimony, but no documentary evidence, of one or two commercials for radio advertising ROSSO ANTICO during the Christmas 1977 season on an Italian-language radio station (Tr. 280–281).

97. Lionel Braun, the distributor for Gio. Buton in the 1976–1980 period, testified that the amount of print advertising, which was directed to the trade and to Italian-language readers, was about $3,000 for that period (Braun dep. 19). Braun stated: "Their brandy was primarily ROSSO ANTICO, which no one ever knew of as Buton" (Braun dep. 22).

98. The VECCHIA ROMAGNA and ROSSO ANTICO names appear on sales promo-

tional materials (DX U–X, Z, AA, MM–1 to MM–7, RR–UU, YY, ZZ). There were 100 to 250 cafe umbrellas imported into the United States in the 1977 to 1981 period which have the following writing: "Buton Brandy" and "Rosso Antico Aperitif" (Tr. 246–247, 263–264, DX RR). Additionally, the number of other sales promotional materials was not indicated and no documents were produced which showed any shipment into, or receipt in, the United States of any promotional material (Tr. 264), although such documents were requested by trial subpoenas to Gio. Buton (PX 45) and to Mediterranean (PX 44). An indication of the volume of such sales promotional materials is that the present inventory of Mediterranean's is in the range of $3,000 to $5,000 (Tr. 303–304).

99. The August, 1980 *Beverage Media* (containing a listing of distributors of brands which are Gio. Buton's products) identified these products as VECCHIA ROMAGNA and ROSSO ANTICO and not as Buton or Gio. Buton & C. S.p.A. VECCHIA ROMAGNA and ROSSO ANTICO (Tr. 261–263; PX 37A, 37B). In a recent edition for May, 1981, Gio. Buton's products are identified as VECCHIA ROMAGNA BUTON and ROSSO ANTICO BUTON (DX–PP).

100. Gio. Buton competes with various European brandy manufacturers, such as Stock, Hennessey, Courvoisier, Martell (Tr. 270–272) who export their brandies to the United States. At least two of these brandy manufacturers, Courvoisier and Martell, do not sell table wine under their trademark in the United States (Tr. 270–272).

101. Gio. Buton has never been in the table wine business in the United States (DX A–3, questions 14–15) and indeed is not presently in the table wine business anywhere in the world (Tr. 283). Gio. Buton sells sparkling wine in two countries other than the United States, but not under its own name; no sparkling wine made by Gio. Buton is sold in the United States (Tr. 234–235; DXA–3, question 14; DX–T).

102. Consumer confusion between two trademarks depends on the spelling of the marks, how they are pronounced, how they appear, the channels of trade in which the goods bearing the marks are sold, and the sophistication of the consumers buying the goods. The appearance includes the relative prominence of any trademark used.

103. No actual product in evidence shows the BUTON mark as the predominant or sole mark for Gio. Buton products; all of Buitoni USA's actual products in evidence show the BUITONI mark as the predominant or sole mark.

104. No actual advertisement or promotional material distributed prior to Gio. Buton's commencement of the cancellation proceeding, or entered in evidence, shows the BUTON mark as the predominant or sole mark for Gio. Buton products; all of Buitoni USA's actual advertisement and promotional materials in evidence show the BUITONI mark as the predominant or sole mark.

105. Gio. Buton has not sold table wine in the United States and is not in the table wine business anywhere in the world (Tr. 283).

106. In about 27 states, wine and food are sold in the same stores and to the same customers (Tr. 199).

107. In contrast to table wine, which is drunk during a meal, brandy and aperitif wines are not drunk along with food, but, as the advertisements for Gio. Buton's ROSSO ANTICO say, it is likely to be consumed "before and after" the meal (Tr. 350–51). Gio. Buton's products are also drunk at times other than at mealtimes. Gio. Buton's ROSSO ANTICO aperitif wine and its VECCHIA ROMAGNA brandy are not closely related products to BUITONI table wine and BUITONI Italian-style foods.

108. The names BUTON and BUITONI are not subject to similar pronunciations. Indeed, while BUITONI would be considered by consumers as being an Italian name, the name BUTON would not be considered an Italian name, but of possible French derivation (Tr. 26), which it is (DX M–1). The two names are spelled differently.

## CONCLUSIONS OF LAW

■ 1. The term "strength" as applied to trademarks refers to the distinctiveness of a mark, or more precisely, its ability to identify the goods sold under the mark as emanating from a particular although possibly anonymous source. *E.I. DuPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F.Supp. 502, 512 (E.D.N.Y.1975); *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2nd Cir. 1979); see also *Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1196 (S.D.N.Y. 1980), *aff'd mem*, 636 F.2d 1203 (2nd Cir. 1980).

■ 2. Strength of a mark may be derived from the intrinsic quality of the mark or from its public history. *E.I. DuPont de Nemours & Co.*, 393 F.Supp. at 512, *McGregor-Doniger Inc.*, 599 F.2d at 1132. The ultimate test of strength of a mark is the mark's actual recognition among the consuming public. *E.I. DuPont de Nemours & Co.*, 393 F.Supp. at 512. Here, the mark BUITONI is widely known among the consuming public. See also *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 381 (7th Cir. 1976).

■ 3. In assessing a mark's actual recognition among the consuming public, the courts look to various factors including:

a) the sales figures for the trademarked products; *Proctor & Gamble*, 485 F.Supp. at 1197, and *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167 at 1173 (2nd Cir. 1976).

b) the advertising and promotion expenditures for trademarked products; *Proctor & Gamble*, 485 F.Supp. at 1197, *Scarves by Vera*, 544 F.2d at 1173;

c) the extent of third party uses and registrations of the same mark, *Proctor & Gamble Co.*, 485 F.Supp. at 1197 and *Scarves by Vera*, 544 F.2d at 1173 (here there are no third party uses and/or registrations of the same mark);

d) the recognition received by the mark's owner and the trademarked products. *Scarves by Vera*, 544 F.2d at 1173.

■ 4. A mark which has acquired great distinctiveness among consumers is entitled to a high degree of protection. *Scarves by Vera*, 544 F.2d at 1173–1175, *E.I. DuPont de Nemours & Co.*, 393 F.Supp. at 512, *McGregor-Doniger Inc.*, 599 F.2d at 1132. The high degree of protection afforded to a strong mark is given even when the goods of the parties are not in competition, *E.I. DuPont de Nemours & Co.*, 393 F.Supp. at 512 and *Scarves by Vera*, 544 F.2d at 1175.

■ 5. Common law trademark rights to a name, such as Gio. Buton or Buton (or Buitoni) which can be asserted against another's use of the same or a similar name, arise only as a result of sufficient sales and advertising under the name, so that the public associates the name with the goods sold under the name, i.e., the name has acquired "secondary meaning", *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 398, 499 (2d Cir. 1962); see J. Gilson, *Trademark Protection and Practice* § 2.08 (1980).

■ A family name, such as Buton, even though it may not be a common name, still requires such secondary meaning before it is afforded protection as a trademark. In re *Glen Raven Knitting Mills, Inc.*, 153 U.S. P.Q. 134 (T.T.A.B. 1967).

6. Buitoni USA has three registered trademarks for BUITONI; Gio. Buton has no registered trademarks for BUTON.

■ With respect to registered trademarks, there is a presumption that secondary meaning exists. *Curtis-Stephens-Embry, Co. v. Pro-Tek-Toe Skate Stop Company*, 199 F.2d 407, 413 (8th Cir. 1952); *Roto-Rooter Corp. v. O'Neil*, 513 F.2d 44, 46–47 (5th Cir. 1975). No evidence rebutting this presumption as to the three BUITONI registrations was presented, i.e., for either the food registrations or the wine registration.

■ 7. Trademark or trade name use in foreign countries does not create protectible trademark rights in the United States; such use by Gio. Buton is not use in commerce within the United States or use in commerce from a foreign country to the

United States. *LeBlume Import Co. v. Coty*, 293 F. 344, 350 (2d Cir. 1923); *Coty Inc. v. Parfums De Grande Luxe*, 298 F. 865, 871 (2d Cir. 1924), *cert. den.*, 266 U.S. 609, 45 S.Ct. 94, 69 L.Ed. 466 (1925); *Johnson & Johnson v. Diaz*, 339 F.Supp. 60, 63–64 (C.D.Cal.1971); *Cooper's Inc. v. Jockey Shoe Polish Inc.*, 149 U.S.P.Q. 704, 706 (T.T.A.B. 1966); *Scotto v. Mediterranean Importing Co., Inc.*, 162 U.S.P.Q. 415, 417 (T.T.A.B. 1969). See also *Rogers v. Ercona Camera Corp.*, 277 F.2d 94, 97 (D.C. Cir. 1960); *Lanolin Plus Cosmetics, Inc. v. Bonne Bell, Inc.*, 89 U.S.P.Q. 612, 613 (Com. Pat.1951).

8. Irregular and negligible amounts of imports of related goods do not create intervening rights which are sufficient to prevent the expansion of the use of a well-known trademark onto related goods. *Scarves by Vera, Inc. v. Todo Imports, Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976). Even larger amounts of sales may not create intervening rights to prevent such expansion to related goods, *Alfred Dunhill of London, Inc. v. Kasser Dist. Prod. Corp.*, 350 F.Supp. 1341, 1355 (E.D.Pa.1972), aff'd, 480 F.2d 917 (3d Cir. 1973). Here, Gio. Buton *had* sold *no* table wine in the United States and so had not obtained intervening rights as to those goods.

9. "[T]he concept of priority in the law of trademarks is applied 'not in its calendar sense' but on the basis of 'the equities involved.'" *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 534 (2d Cir. 1964); *Manhattan Industries, Inc. v. Sweater Bee By Banff*, 627 F.2d 628, 630 (2d Cir. 1980). See also 3 Callmann, *Unfair Competition, Trademarks and Monopolies*, § 76.3(a) (2d Ed.) 302: "Although adherence to the principle of priority has the advantage of temporal consistency, if it is applied as the dispositive test to resolve a trademark conflict, it might often result in injustice."

10. The standard by which the likelihood of confusion should be judged is the average consumer who is "an ordinar[y] prudent buyer—not a careless buyer who makes no examination." *Dawn Donut Co. v. Day*, 450 F.2d 332, 333 (10th Cir. 1971).

11. A District Court is not circumscribed by the [Trademark Trial and Appeal] Board's interpretation of either (i) court decisions or (ii) the Trademark Trial and Appeal Board's conclusions of law. *Royal Crown Cola Co. v. Crown Beverage Corporation*, 195 F.Supp. 130, 132 (E.D.N.Y. 1961).

12. Where there are issues not before the Trademark Trial and Appeal Board, and such issues are raised in broader litigation in the District Court, all issues raised in the broader pleadings may be considered by this court. *Proctor & Gamble & Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1208 (S.D.N.Y.1979), aff'd mem., 636 F.2d 1203 (2d Cir. 1980).

13. The most cited authority on burden of proof in an action to overturn an administrative decision of the Patent and Trademark Office is *Morgan v. Daniels*, 153 U.S. 120, 124, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894), a patent interference case where it is stated that the Patent Office decision is controlling "unless the contrary is established by [evidence] which in character and amount carries thorough conviction." *Id.* at 125, 14 S.Ct. at 773. There is no separate authority which specifically recites the burden of proof as it specifically pertains to trademark administrative proceedings. In *Morgan*, no new testimony over that testimony which was presented to the Patent Office in the original administrative (patent interference) proceeding was introduced in any subsequent proceedings in the Patent Office or in District Courts.

14. An administrative decision can, in fact, be reversed without any new evidence. *Cody v. Aktiebolaget Flymo*, 452 F.2d 1274, 1279–80 (D.C.Cir. 1971), *cert. den.*, 405 U.S. 990, 92 S.Ct. 1254, 31 L.Ed.2d 456 (1972). As also stated by a Court of Appeals: "[T]he less 'new' evidence there is before the district court, the more blatant the [Patent Office's] factual errors must have been before the district court is justified in reversing the [Patent Office's]

award." *Rex Chainbelt, Inc. v. Borg-Warner Corporation*, 477 F.2d 481, 487 (7th Cir. 1973). If *Morgan* be the test for trademark administrative decisions, in this case there has been extensive and substantial evidence in both character and amount which carries the "thorough conviction" indicated by *Morgan*.

15. Under 15 U.S.C. § 1071(b)(1), this Court may adjudge "such other matter as the issues in [these *trial de novo*] proceeding[s] require, as the facts in the case may appear." Therefore, this Court concludes that the cancellation order of the Trademark Trial and Appeal Board will be revoked, subject to the modification adjudged in this Memorandum and Order, *supra*.

16. Under 15 U.S.C. § 1119, this Court may "otherwise rectify the register", i.e., a registration may be modified. Consequently, Buitoni USA Trademark Registration 1,040,711 for "wine" will be modified so that its description of goods reads "table wine". *Durox Company v. Duron Paint Manufacturing Company*, 320 F.2d 882, 887 (4th Cir. 1963).

17. It is undisputed that this Court has jurisdiction over Gio. Buton; Gio. Buton has a pending application to register its trademark BUTON. This Court may order the modification of a pending trademark application or even the issuance of a trademark registration where an application has not yet been filed in order to resolve the trademark issues between the parties. *Avon Shoe Co. v. David Crystal, Inc.*, 171 F.Supp. 293, 314 (S.D.N.Y.1959), aff'd, 279 F.2d 607 (2d Cir. 1960); *Massa v. Jiffy Products Co., Inc.*, 240 F.2d 702, 707 (9th Cir. 1957), *cert. den.*, 353 U.S. 947, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957). Gio. Buton's pending application for brandy, wine and liqueurs should be amended to recite "brandy, aperitif wines and liqueurs" as its description of products. In Gio. Buton's United States States Trademark Registrations Nos. 1,074,395 and 1,128,749 for ROSSO ANTICO the description of the product is "aperitif wine".